## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| DEBORAH VIGEANT, and all other individuals similarly situated,<br><br>                    Plaintiff,<br><br>vs.<br><br>MICHAEL MEEK, PAUL HARMEL,<br>P. ROBERT LARSON, DONALD GOLDFUS,<br>JOHN ANDERSON, BRUCE NICHOLSON,<br>BERNIE ALRICH, and NEWPORT TRUST<br>COMPANY,<br><br>                    Defendants. | Case No.:<br><br>**CLASS ACTION COMPLAINT**<br><br><br>JURY TRIAL DEMANDED |

## CLASS ACTION COMPLAINT FOR VIOLATIONS OF
## THE EMPLOYEE RETIREMENT INCOME SECURITY ACT

1.      Plaintiff Deborah Vigeant ("Plaintiff"), by and through her attorneys, files this Complaint on behalf of herself and other similarly situated current and former employees of Lifetouch Inc. ("Lifetouch" or the "Company"), or its predecessor companies, who were participants in and beneficiaries of the Lifetouch Inc. Employee Stock Ownership Plan (the "Plan") and who were invested in Lifetouch stock during the period of June 30, 2015 through the present (the "Class Period").

2.      This is a class action brought pursuant to Section 502 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132, by participants in the Plan, and on behalf of the Plan, to recover hundreds of millions of dollars of damage suffered in their retirement accounts due to breaches of fiduciary duties owed to them.

3.      Plaintiff alleges the following based on the investigation of her counsel, which included a review of the Plan's governing documents; the Plan's annual reports filed with the U.S.

Department of Labor ("DOL"); discussions with Plan participants; other lawsuits against Lifetouch; press releases and other public statements issued by Lifetouch; media reports about Lifetouch; and Securities and Exchange Commission ("SEC") filings by Shutterfly, Inc. ("Shutterfly") about Lifetouch. Plaintiff believes that substantial additional evidentiary support exists and will emerge for the allegations set forth herein after there has been a reasonable opportunity for discovery.

## I. INTRODUCTION

4.       Lifetouch is a professional photography company that has focused primarily on the school picture business for over 80 years. It has ranked as one of the nation's five largest 100% employee-owned companies. Since it was founded in 1936, Lifetouch has expanded its operations through a series of acquisitions. In the early 1980s, Lifetouch acquired the company that operated portrait studios located in J.C. Penney stores, and it later did the same for those operated in Target stores. Lifetouch also aggressively acquired its competitors, beginning with Olan Mills' school photography business in 1999 and later with Herff Jones' photography division in 2011. But with the rise of the digital age, the photography business is not what it once was.

5.       Beginning in 2015, the price of Lifetouch stock has been in decline, and for the more than 16,000 employees who participate in the Company's Plan, so have the holdings on which they rely as their primary source of retirement savings. Each year has been worse than the last. Fiscal year 2015 saw a decrease of nearly 10%. While fiscal year 2016 was slightly better with a decrease of just over 5%, fiscal year 2017 saw an astounding 36% drop.

6.       This downward spiral continued right up until the January 30, 2018 announcement of Lifetouch's acquisition by Shutterfly for $825 million, which price indicates a further decrease of 17.5% in only a few months' time. Since June 30, 2015, the value of Lifetouch stock held by

the Plan decreased by over $840 million, or over 50%.  By a very crude calculation, that represents an average loss of over $52,000 in retirement savings for each of the roughly 16,000 Plan participants.

7.   All of this happened while the Plan's fiduciaries, who owed "the highest [duty] known to the law" to Plan participants, sat idle and disregarded their responsibilities for overseeing the prudence of the Lifetouch stock investment held by the Plan.

8.   The Plan is a defined contribution plan governed by ERISA.  Sponsored by Lifetouch, the Plan's purpose is to enable eligible employees to acquire a beneficial interest in Lifetouch to share in the growth and prosperity of Lifetouch and accumulate retirement savings. All contributions to the Plan were made by the Company and invested primarily in shares of Lifetouch stock.  During the Class Period, Lifetouch stock was the largest single investment purchased and held by the Plan.

9.   ERISA is a landmark federal law enacted to promote the interests of employees and their beneficiaries. It seeks to protect contractually defined benefits owed to those employees and beneficiaries.  To that end, the statute imposes stringent duties on plan fiduciaries.  *See* ERISA § 404, 29 U.S.C. § 1104 (establishing standard of care); 29 C.F.R. § 2550 (DOL rules and regulations for fiduciaries).  These fiduciary duties are the "highest known to the law." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982).  ERISA also gives participants and their beneficiaries the right to sue breaching fiduciaries to recover losses on behalf of the plan.  ERISA § 409; 29 U.S.C. § 1109 (breaching fiduciaries "shall be personally liable to make good"); ERISA § 502; 29 U.S.C. § 1132 (creating right of action to enforce 29 U.S.C. § 1109).

10.   Defendants are the Plan's Trustee (the "Trustee") and members of Lifetouch's Board of Directors (the "Board") (collectively, "Defendants"), all of whom are the Plan's "Named

Fiduciaries." As fiduciaries, Defendants were responsible for overseeing the prudence of the investment held by the Plan, Lifetouch stock, and for the Plan's management and operations.

11. This case is simple. During the Class Period, Lifetouch stock constituted an imprudent investment for Plan assets. Not only did Defendants allow Plan assets to remain imprudently invested, but they also actively invested new contributions to the Plan in the very same imprudent investment. Lifetouch stock was an imprudent investment for two reasons: (i) it was overvalued during 2015 and 2016; and (ii) the value of the Company, and thus the stock price, was in rapid decline. The Trustee knew both of these facts because it was responsible for determining the value of Lifetouch stock. The Board not only knew both of these facts, because it controlled the entire company and had unfettered access to and knowledge of all operational and financial data, but also because it actively condoned the overvaluation period for the benefit of Lifetouch's retiring senior executives, including one of the Board's own members, then-CEO (and current Defendant) Paul Harmel.

12. Lifetouch's unsettling decline began in 2015. Years of aggressive and costly acquisitions and equally costly attempts to bring itself into the digital age had finally caught up with the Company. Senior executives, always the first to know, began plotting their exits. Indeed, this wave of senior executive "retirements" occurred during 2015 and 2016—conveniently just before the first major decline in Lifetouch stock price took place.

13. Senior executives were able to redeem the Lifetouch stock they held in their Plan accounts at favorable share prices during 2015 and 2016 even as Lifetouch was in the midst of widespread closures of their J.C. Penney and Target portrait studios, and most notably the closing of their Charlotte, North Carolina production facility, the latter of which resulted in the laying off

of 206 Lifetouch employees. Kelvin Miller, a Lifetouch Vice President, characterized the facility's closing as "simply an economic decision."

14.     The last executive to retire from Lifetouch, after 40 years with the Company, was its own Chief Executive Officer Paul Harmel. Defendant Harmel retired in July of 2016, just after the annual valuation of Lifetouch stock, which is determined by the Trustee—which, in turn, is overseen by the Board—which included Defendant Harmel. Despite the continued closing of portrait studios, loss of senior executives, and the shutting down of facilities for economic reasons, on June 30, 2016 the Trustee valued Lifetouch stock at $88 per share, down from $93 the year before, but hardly the diminution in value that might be expected given Lifetouch's ample, deep-seated problems. Meanwhile, since only employees of Lifetouch can own its stock, Harmel's Plan holdings were cashed out at $88 per share. Just 11 months later at the next valuation of the Lifetouch stock, the share price plummeted to $56 per share—while Harmel, not to mention the other senior executives whose retirements preceded his, was already free and clear.

15.     Defendants, as the "Named Fiduciaries," should have been closely monitoring and reviewing Lifetouch stock for continued prudence and compliance with ERISA standards.

16.     While senior executives were retiring, liquidating their Plan accounts and benefiting from the artificially inflated Lifetouch stock prices of 2015 and 2016, Defendants were welcoming Company contributions into the Plan and purchasing shares at overvalued prices. Defendants, especially the Board, knew the true value of Lifetouch stock and knew the Plan was overpaying for each share. Due to the inflated price per share, Company contributions did not acquire as many shares and thus Plan participants received fewer shares in their individual accounts. As of June 30, 2016, Defendants should have afforded Plan participants the same

benefits that Lifetouch's CEO would soon receive just a month later—the chance to liquidate their Plan holdings of Lifetouch stock.

17.     From June 2016 to June 2017, Defendants, especially the Board, whose members were intimately involved in every operational and fiscal decision for the Company, did nothing while the value of the Company decreased and Plan participants' retirement savings dwindled away.  In June of 2017, at the time of the annual Lifetouch stock price valuation, the Trustee determined the value of each Lifetouch share to be $56.  However, despite the 36% drop in share price, Defendants bought **even more** shares of Lifetouch for the Plan.

18.     Lifetouch stock was no longer prudent for the Plan, either as an investment for new contributions or as a holding for retirement money, dating as far back as June of 2015.  No prudent fiduciary under ERISA should have continued to invest in Lifetouch stock or to keep it in the Plan. Defendants were obligated to take action to prevent harm to the Plan and its participants.

19.     Defendants, however, did nothing.  Defendants failed to divest the Plan of Lifetouch stock when it became an imprudent investment.  Defendants continued to invest Company contributions in Lifetouch stock even though they knew it was overvalued during 2015 and 2016.  Defendants failed to warn Plan participants of Lifetouch's dire situation during 2016 and into 2017, knowing of the stock's impending collapse.  As a result of Defendants' lack of prudent action, Plaintiff and other Plan participants were significantly damaged; the Plan and its participants have suffered hundreds of millions of dollars in losses that were entirely avoidable.

20.     Defendants were required by ERISA to exercise due care, skill, prudence and diligence when making decisions with respect to selecting, removing, replacing and monitoring the Plan's investments. Defendants' fiduciary duties are among the "highest known to the law." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982).  Consistent with these fiduciary

duties, Defendants were obligated to ensure Plan assets were invested only in prudent investments. A fiduciary has "a continuing duty of some kind to monitor investments and remove imprudent ones" and "a plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1829 (2015). In violation of these duties, Defendants failed to monitor the continued prudence of Lifetouch stock, and they failed to remove it when it became an imprudent investment for the Plan.

21.     As more fully set forth below, Defendants breached their fiduciary duties owed to the Plan and its participants, including those fiduciary duties set forth in ERISA § 404, 29 U.S.C. § 1104, and Department of Labor ("DOL") Regulations, 29 C.F.R. § 2550. As a result of these breaches, Defendants are liable to the Plan and Plan participants for all losses resulting from each such breach of fiduciary duty.

22.     Plaintiff's First Cause of Action alleges that it was imprudent for Defendants to permit the Plan to maintain Lifetouch stock as an investment during the time when it was overvalued and during the time it was experiencing a rapid decline in value. Plaintiff's Second Cause of Action, against the Board Defendants, alleges that the Board failed in their duties to monitor the Trustee, a fiduciary they appointed to invest and control the assets of the Plan. Plaintiff's Third Cause of Action alleges that the Board Defendants breached their fiduciary duty of loyalty by creating and furthering the overvaluation of Lifetouch stock for the benefit of retiring executives, including Defendant Harmel, to the detriment of other Plan participants.

## II. JURISDICTION AND VENUE

23.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

24.     Venue is proper in this district under ERISA §502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plan was administered in this district and some or all of the fiduciary breaches for which relief is sought occurred in this district.

### III.  THE PARTIES

#### A.    <u>Plaintiff</u>

25.     Plaintiff Deborah Vigeant is a Plan participant within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7).  She is a current employee of Lifetouch who was and continues to be a participant in the Plan.  She held shares of Lifetouch stock in her Plan retirement savings account during the Class Period.

26.     Plaintiff brings this action on behalf of a class of all participants in the Plan whose retirement assets were invested in Lifetouch stock during the Class Period.

#### B.    <u>Defendants</u>

27.     Defendant Michael Meek is and was, since July 2016, the Chief Executive Officer ("CEO") of Lifetouch, a member of Lifetouch's Board of Directors, and a fiduciary of the Plan pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) because he was and is a "Named Fiduciary" as a member of Lifetouch's Board of Directors and because he had discretionary authority and control over the investments of the Plan, investments in Lifetouch stock, and administration of the Plan.  Prior to July 2016, Michael Meek was the Chief Operating Officer of Lifetouch.

28.     Defendant Paul Harmel is and was a member of Lifetouch's Board of Directors, and a fiduciary of the Plan pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) because he was and is a "Named Fiduciary" as a member of Lifetouch's Board of Directors and because he had discretionary authority and control over the investments of the Plan, investments in Lifetouch

stock, and administration of the Plan. Paul Harmel was the CEO of Lifetouch until July 2016 when retired; from July 2016 through the present he serves as Chairman of the Board.

29.     At all times, defendant P. Robert Larson is and was a member of Lifetouch's Board of Directors, and a fiduciary of the Plan pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) because he was and is a "Named Fiduciary" as a member of Lifetouch's Board of Directors and because he had discretionary authority and control over the investments of the Plan, investments in Lifetouch stock, and administration of the Plan.

30.     At all times, defendant Donald Goldfus is and was a member of Lifetouch's Board of Directors, and a fiduciary of the Plan pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) because he was and is a "Named Fiduciary" as a member of Lifetouch's Board of Directors and because he had discretionary authority and control over the investments of the Plan, investments in Lifetouch stock, and administration of the Plan.

31.     At all times, defendant John Anderson is and was a member of Lifetouch's Board of Directors, and a fiduciary of the Plan pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) because he was and is a "Named Fiduciary" as a member of Lifetouch's Board of Directors and because he had discretionary authority and control over the investments of the Plan, investments in Lifetouch stock, and administration of the Plan.

32.     At all times, defendant Bruce Nicholson is and was a member of Lifetouch's Board of Directors, and a fiduciary of the Plan pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) because he was and is a "Named Fiduciary" as a member of Lifetouch's Board of Directors and because he had discretionary authority and control over the investments of the Plan, investments in Lifetouch stock, and administration of the Plan.

33.    At all times, defendant Bernie Alrich is and was a member of Lifetouch's Board of Directors, and a fiduciary of the Plan pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) because he was and is a "Named Fiduciary" as a member of Lifetouch's Board of Directors and because he had discretionary authority and control over the investments of the Plan, investments in Lifetouch stock, and administration of the Plan.

34.    Defendant Newport Trust Company, a New Hampshire chartered trust company, is and was the Plan's Trustee, and a fiduciary of the Plan pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) because it had discretionary authority and control over the investments of the Plan and investments in Lifetouch stock.  Evercore Trust Company, N.A., the Trustee defined under the Lifetouch Inc. Employee Stock Ownership Trust Agreement, as restated, effective June 28, 2017 (the "Trust Agreement") was acquired by Newport Group Inc. and its subsidiary Newport Trust Company Trust Company as of October 18, 2017 and now operates through Newport Trust Company.

## IV.  THE PLAN AND ITS FIDUCIARIES

35.    The Plan is a defined contribution plan under ERISA sponsored by Lifetouch to enable eligible employees to acquire a beneficial interest in Lifetouch in order to share in the growth and prosperity of Lifetouch and accumulate retirement savings.  Upon commencement of employment, Lifetouch employees who have been paid for at least 700 hours of service during the Plan year are eligible to participate in the Plan.  The Plan year runs from July 1 to June 30. Employees are subject to a vesting schedule and become fully vested after six years of service.

36.    The Board of Directors is a named fiduciary under the Plan.  Some of the duties and responsibilities of the Board include:  (i) amending or terminating the Plan; (ii) decisions regarding selection, retention or removal of Trustee; and (iii) periodically reviewing the

performance of the Trustee and persons to whom duties have been allocated or delegated. These duties and responsibilities may be allocated or delegated—although they may not be abrogated.

37.    The assets of the Plan are invested and controlled by the Trustee. The Company created the Lifetouch Inc. Employee Stock Ownership Trust (the "Trust") for the purpose of holding and investing the Plan's assets. Under the terms of the Plan, the Trustee is selected by the Board of Directors. Evercore Trust Company, N.A., now known as Newport Trust Company—Evercore Trust Company, N.A. was acquired by Newport Group Inc. and its subsidiary Newport Trust Company Trust Company as of October 18, 2017 and now operates through Newport Trust Company—is the Plan's Trustee.

38.    The duties and responsibilities of the Trustee are governed by both the Trust Agreement, and by ERISA. Under the terms of the Trust Agreement the Trustee "shall hold, invest, reinvest, manage, administer, and distribute" the assets of the Trust "for the exclusive benefit" of Plan participants. The Trust assets must be "invested with the skill, prudence and diligence under the circumstances then prevailing that a prudent investor familiar with such matters would use in the conduct of an enterprise of like character and with like aims…."

39.    All contributions to the Plan are made by the Company and invested primarily in shares of Lifetouch stock. Employees may not contribute to the Plan. Contributions to the Plan are made annually in an amount determined by the Board. The Board must establish the amount of the contribution by the due date for the filing of the Company's tax return. The contribution may be paid in cash, shares of Lifetouch stock, or other property as determined by the Board.

40.    The price, or fair market value, of Lifetouch stock is determined by the Trustee with an opinion of an Independent Appraiser. The Independent Appraiser is appointed by the Trustee. This determination is made annually on June 30.

41.     Under the terms of the Plan and the Company Charter, ownership of Lifetouch stock is restricted to Company employees.  Distribution of Plan accounts is normally made in cash; a Plan participant is not entitled to receive a distribution in the form of Lifetouch stock.  In the event of a distribution, Lifetouch stock will be repurchased by the Company at the fair market value, which is the price of Lifetouch stock as determined by the Trustee on the June 30 immediately preceding the repurchase date.

## V.  DEFENDANTS' FIDUCIARY BREACHES

### A.     <u>The Trustee Defendant</u>

42.     The Trustee owed duties of prudence and loyalty to Plan participants under the terms of the Plan and under ERISA.  Those duties were breached when the Trustee:  (i) improperly overvalued Lifetouch stock on the June 30, 2015 and June 30, 2016 fair market value determination dates; (ii) allowed Plan assets to remain invested, and continued investing new Plan assets, in Lifetouch stock knowing that the investment was imprudent for the Plan under ERISA without providing disclosure or warning to the Plan participants; and (iii) approved the acquisition of Lifetouch by Shutterfly on a date before January 30, 2018 at a price below fair market value.

43.     The Trustee is charged with determining the fair market value of Lifetouch stock each year on June 30.  In making this determination, the Trustee appoints an Independent Advisor and takes into consideration its advice and opinion.  Under the terms of the Trust Agreement, the Trustee was also empowered to retain "agents, attorneys, … accountants, or other persons of its choice" to advise it in determining the value of Lifetouch stock.  Had the Trustee properly utilized the extensive professional resources available for determining the value of Lifetouch stock, perhaps the stock price would not have been so grossly overvalued in 2015 and 2016.

44.    On June 30, 2015, the Trustee valued Lifetouch stock at $93 per share.  This represented a decrease of almost 10% from the 2014 valuation.  On June 30, 2016, the Trustee valued Lifetouch stock at $88 per share.  This represented a decrease of just over 5% from the previous year's valuation.  On June 30, 2017, the Trustee valued Lifetouch stock at $56 per share. Although this represented a 36% decrease from the previous year's valuation, the only material change that took place during the 2017 fiscal year was the retirement of CEO Paul Harmel and replacement with current CEO Michael Meek.  This change took place in July of 2016 and was known before the Trustee performed its 2016 fiscal year valuation on June 30, 2016.  Any negative impact that the CEO's replacement, although unlikely, would have had on the value of the Company should already have been reflected in the 2016 fiscal year valuation.  After all, this was the only material event that occurred at Lifetouch during the 2017 fiscal year.

45.    In fact, Lifetouch appeared to be facing far more serious problems during 2015 and 2016, suggesting that those valuations should have seen a far greater decrease than the 2017 valuation if they had been properly calculated.  An unusually large number of Lifetouch senior executives began retiring from the Company during 2015 and 2016.  Lifetouch was losing highly valued and experienced employees.  The last senior executive to retire was then-CEO Paul Harmel in July 2016.  Lifetouch also reported that, during 2015 and 2016, it continued to shut down J.C. Penney and Target portrait studio locations.   Perhaps the strongest evidence of Lifetouch's financial troubles came in November of 2015 when it announced the closing of its Charlotte, North Carolina production facility.   Lifetouch had acquired this facility just four years earlier from competitor Olan Mills, yet was now forced to close it and lay off 206 employees.  Kelvin Miller, a Lifetouch corporate vice president, told *The Charlotte Observer* that the closing was "simply an economic decision."

46.     The Trustee's improper valuation of Lifetouch stock in 2015 and 2016 harmed Plan participants.  The duties and responsibilities of the Trustee are governed by the Trust Agreement and ERISA.  Under the terms of the Trust Agreement, the Trustee "shall hold, invest, reinvest, manage, administer, and distribute" the assets of the Trust "for the exclusive benefit" of Plan participants.  The Trust assets must be "invested with the skill, prudence and diligence under the circumstances then prevailing that a prudent investor familiar with such matters would use in the conduct of an enterprise of like character and with like aims…."  Because the shares were overvalued by the Trustee, the contribution that Lifetouch made to the Plan in those years was not able to purchase as many shares of Lifetouch stock, which resulted in fewer shares of stock available to distribute to Plan participant accounts.

47.     The Trustee should not have overvalued Lifetouch stock in the first place.  Failing that, the Trustee had the power and duty to divest the Plan of Lifetouch stock as soon as it became imprudent due to being overvalued.  Plan participants held Lifetouch stock to share in the growth and prosperity of the Company and to accumulate capital for their future economic security.  The Trustee could have mandated the redemption of Plan participants' stock holdings until such time as Lifetouch reversed its precipitous decline and its stock once again became a prudent investment.  Had the Trustee acted properly and divested the Plan out of Lifetouch stock in June of 2016, for example, losses to the Plan of $745,510,160 would have been avoided, or an average loss of nearly $50,000 of retirement savings per Plan participant.

48.     The Trustee also acted improperly when it used the 2017 employer contribution to purchase Lifetouch stock for the Plan after the value of the stock had declined by 36%.  As discussed *supra*, the Trustee determines the value of Lifetouch shares on June 30 of each year.  Under the terms of the Plan, the Company, through a Board resolution, determines the amount of

the employer contribution to the Plan by "the due date for filing the Company's federal income tax return for that year…."  By the time the Trustee receives the contribution funds for investing, it has already determined the price at which it will purchase shares of Lifetouch stock for the Plan. An investment that has declined in value by 36% in one year, after already declining significantly in value over the previous two fiscal years, is too risky an investment for the retirement savings of employees to whom fiduciary duties are owed.

49.     Also, as discussed further *infra*, at the time it received the fiscal year 2017 employer contribution to the Plan for investment into Lifetouch stock, the Trustee was already aware that price of Lifetouch stock would drop further from its price of $56 per share in fiscal year 2018.  If ever there was a time for the Trustee to act to protect the interests of its fiduciary wards, that was it.

50.     Consider that, under the terms of the Plan, the Trustee received the 2017 employer contribution in or around September 15, 2017, the date on which Lifetouch's federal corporate tax returns would have been due.  In a January 30, 2018 *StarTribune* article announcing the acquisition, CEO Michael Meek stated that Lifetouch "had put itself up for sale in the recent months" because the Company "wasn't growing fast enough to generate sufficient cash flow to invest in new technology and in other ways in the business … [g]rowth has slowed."  The article further quotes Meek in stating that the $825 million acquisition figure "approximates the value of the company assigned by an independent business evaluator who estimates the worth of Lifetouch every year on behalf of the independent trustee for the Employee Stock Ownership Plan…."

51.     The "independent trustee" referenced by Meek in the article is the Plan's Trustee, the same Trustee that while in the process of engaging their "independent business evaluator" to perform a valuation of Lifetouch for an upcoming sale of the company due to slowed growth and

cash flow problems, invested the 2017 employer contribution to the Plan in the very stock it knew would soon experience further declines in value.  It is certainly reasonable to infer that, at the time that the Trustee was deciding whether to invest the 2017 employer contribution in Lifetouch stock, it knew that the Company was being shopped around and that further stock price declines were in the offing.  At this time, as on multiple prior occasions throughout the Class Period, the Trustee had sufficient cause and reason to reassess and reevaluate Lifetouch stock as the investment vehicle for Plan assets—yet the Trustee did not do so.

52.   Lifetouch and Shutterfly may have commenced acquisition discussions as early as August 2017.  A loan commitment letter furnished by Morgan Stanley, the lender providing Shutterfly $825 million in financing for the Lifetouch acquisition, filed on January 30, 2018 with the SEC, references an earlier credit agreement entered into between Shutterfly and Morgan Stanley.  This earlier agreement, executed on August 17, 2017, provided Shutterfly with $500 million in credit that may be used to acquire "all or substantially all of the Equity Interests or assets or business of another Person or assets constituting a business unit, line of business, or division…."  The agreement further provided Shutterfly the option of securing "Acquisition-Related Incremental Commitments" at a future date.

53.   Alternatively, the Trustee could have recommended to the Board that Company stock be removed as the investment vehicle for employer contributions to the Plan while it remained an imprudent investment.  The Trustee also should have communicated truthfully and accurately with Plan participants, giving them notice or warning via material disclosure that Lifetouch stock was no longer a prudent investment.  This material disclosure would have given the Plan participants the ability to decide whether to remain in Company stock or divest their holdings to protect their retirement savings.  After all, the Trustee was the fiduciary; it was

supposed to be the investment expert charged with overseeing and preserving Plan participants' retirement savings.   It is not incumbent on Lifetouch employees, who are generally unsophisticated about investments, to take it upon themselves to determine whether Lifetouch stock is a prudent investment.   That is what expert fiduciaries like the Trustee are hired—and paid—to do.

54.    The Trustee's final breach of its fiduciary duties to Plan participants was its approval of the $825 million acquisition of Lifetouch by Shutterfly announced on January 30, 2018.   The value of the Plan's Lifetouch stock holdings alone as of June 2017 was just over $1 billion, yet just months later when evaluated by the very same Independent Appraiser, and on the heels of a 36% decline in value, the value of Lifetouch decreased by another 17.5%.   The $825 million figure represents an approximate value of the company and was assigned only by the Independent Appraiser.   Even though it was empowered to do so, the Trustee did not engage other professionals, such as "agents, attorneys, … accountants, or other persons of its choice" to advise it in making this crucial determination.

55.    Under the terms of the Shutterfly acquisition, the Plan will be closed and all participant accounts will be distributed in cash.   Had the Trustee acted like a fiduciary and in the best interest of Plan participants, over $840 million in losses to the Plan could have been avoided since June 30, 2015.   Since that date, Lifetouch shares have lost over 50% of their value, and its owners, Lifetouch's employees, have suffered.

### B.    The Board of Directors Defendants

56.    The Board owed duties of prudence and loyalty to Plan participants, and they had a duty to monitor the Trustee under the terms of the Plan and ERISA.   Those duties were breached when the Board:   (i) improperly withheld information concerning the deterioration of the

Company to maintain an artificially inflated stock price value during 2015 and 2016; (ii) failed to monitor the performance of the Trustee, a fiduciary that the Board appointed to invest and control the assets of the Plan; and (iii) failed to amend the Plan to remove Lifetouch stock as the investment vehicle for Plan assets when the Board knew Lifetouch stock was imprudent.

57.     The Board of Directors, including CEO Michael Meek and his predecessor Paul Harmel, is charged with directing Lifetouch's affairs in a way that ensures the prosperity of the Company, and, in turn, the prosperity of its owners, the Lifetouch employees.  The Board, including the CEO, runs the entire organization, overseeing all aspects of operations and fiscal matters.  The Board has knowledge of all the organization's proprietary information, both past and present, which it uses to steer the organization towards success.

58.     Unending prosperity, however, is no guarantee for any organization, Lifetouch included.  In 2015, Lifetouch began to fall victim to the digital age.  As consumer tastes evolved from portraits adorning the walls and bookshelves stuffed with photo albums to digital format and cloud-based servers, Lifetouch failed to evolve with them.  Now virtually everyone has a camera right in their pocket.  Thus, beginning in 2015, Lifetouch began to feel the economic strain.  Continued closures of its J.C. Penney and Target brick-and-mortar portrait studio locations were no longer enough.  In November of 2015, Lifetouch was forced to close an entire production facility in North Carolina and lay off 206 of its employees, characterizing the move as "simply an economic decision."  Multiple senior executives took notice and began to retire over the course of 2015 and 2016.

59.     The *StarTribune*, a local Minnesota newspaper, published an article about Lifetouch's struggles in August of 2016, *Lifetouch adjusting its lens to the digital age*.  The article outlines, in great part through quotations from an interview with then-new-CEO Michael Meek,

how the digital age has upended Lifetouch, and its struggles to stay relevant, adapt to modern technology, and satisfy consumer needs.

60.     Even though Lifetouch was in trouble and struggling to turn itself around, the 2015 and 2016 valuations of its stock price seemed not have taken much notice.  All of the retiring senior executives, including former CEO Paul Harmel, who was the last to retire in July of 2016, benefitted from the overvalued stock price when their Plan accounts were distributed upon retirement.  Under the terms of the Plan, Lifetouch stock held in a participant's Plan account is repurchased by the Company at the share price determined by the Trustee on the last valuation date, which for Defendant Harmel was June 30, 2016, before the stock price was lowered by a massive 36%.

61.     Knowing that senior executives were retiring and redeeming Lifetouch shares from their Plan accounts, especially Board member Harmel, the Board evidently withheld Lifetouch's economic struggles from the Trustee to maintain artificially inflated share prices for the 2015 and 2016 valuations.  The Board knew that, under the terms of the Plan, the Trustee would invest the 2015 and 2016 contribution amounts in Lifetouch stock, and since the price of the stock was overvalued, the Trustee would purchase fewer shares than it could otherwise afford if the stock price were correctly valued.  There would be less shares of Lifetouch stock to distribute to eligible employees, so each Plan participant would receive a smaller apportionment.

62.     The Board failed to monitor the performance of the Trustee, a fiduciary it appointed to invest and control the assets of the Plan.  As discussed *supra*, the Trustee improperly overvalued Lifetouch stock in 2015 and 2016.  The Board, having intimate knowledge of all operational and fiscal Company information, was not only in the best position to review and correct these improper valuations, it was also duty-bound to do so under the terms of the Plan and the obligations set

forth in ERISA. The Board knew that the employer contribution to the Plan that it set in 2015 and 2016 would be wholly invested in overvalued Lifetouch stock. They knew Plan participants would receive fewer shares of Company stock then they otherwise would had the shares been properly valued to reflect the real state of the Company. Likewise, the Board knew that the Trustee was continuing to invest Plan assets in an imprudent investment.

63.      The Board should have used its power under the terms of the Plan to amend the Plan and remove the imprudent Lifetouch stock as the Plan's investment vehicle, or replaced it with a prudent and safe alternative investment appropriate for Plan participants' retirement savings, until such time as Lifetouch stock again became a prudent investment for the Plan and for participants' retirement savings. This action was especially relevant and appropriate when the Trustee reported the 2017 Lifetouch stock valuation on June 30, 2017 showing a decline in value of 36% from the prior fiscal year. By the time the Board established the annual employer contribution, in or about September 2017, they not only knew that the value of the stock had declined so much it was an imprudent investment, but they also knew that Lifetouch was facing such extreme financial troubles that the Company had put itself up for sale, meaning that further declines were on the way. The Board knew that the Company's value, and thus the stock price, would decline even further beyond the June 2017 valuation of $56 per share, the price at which the Trustee would purchase Company shares for the Plan. At this time, and multiple other times through the Class Period, having intimate knowledge of the Company's declining financial health and operational challenges, the Board had sufficient cause and reason to reassess and reevaluate Lifetouch stock as the investment vehicle for Plan assets. Yet, despite having all of this information, the Board did nothing, and Plan participants paid the price.

## VI. CLASS ACTION ALLEGATIONS

64.    To the extent appropriate, Plaintiff brings this action as a class action pursuant to

Rules 23(a), (b)(1), (b)(2), and/or (b)(3) of the Federal Rules of Civil Procedure on behalf of

Plaintiff and the following class of persons similarly situated (the "Class"):

> All persons who were participants in or beneficiaries of the Plan at any time from
> June 30, 2015 through the present (the "Class Period") and whose Plan accounts
> included investments in Lifetouch stock (the "Class").

65.    The members of the Class, which is estimated to number in the thousands, are so

numerous that joinder of all members is impracticable. Indeed, based on public filings by the Plan,

there are at least approximately 16,000 potential class members.

66.    Common questions of law and fact exist as to all members of the Class and

predominate over any questions affecting solely individual members of the Class, including:

a.    whether Defendants owed fiduciary duties to the Plan, Plaintiff and

members of the Class;

b.    whether the Board Defendants breached their fiduciary duties to

the Plan, Plaintiff and members of the Class by failing to monitor the

performance of the Trustee;

c.    whether the Defendants breached their fiduciary duties to the Plan,

Plaintiff and members of the Class by failing to act prudently and solely

in the interests of the Plan and the Plan's participants and beneficiaries;

d.    whether Defendants violated ERISA; and

e.    whether the Plan and members of the Class have sustained

damages and, if so, what is the proper measure of damages.

67.     Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff, the Plan and the other members of the Class each sustained damages arising out of Defendants' wrongful conduct in violation of federal law as complained of herein.

68.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained competent counsel experienced in class actions and ERISA litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Plan or the Class.

69.     Class action status is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

70.     Class action status is also warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants.

71.     Class action status is warranted under Rule 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

72.     Class action status is warranted under Rule 23(b)(3) because a class action would be superior to individual actions and common questions of law and fact predominate over individual questions.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
### (Breach of Duty of Prudence – Against All Defendants)

73.     Plaintiff incorporates by reference the paragraphs above.

74.     During the Class Period, Defendants were and are ERISA fiduciaries.

75.     Defendants were and are obliged to prudently manage all of the Plan's assets pursuant to their fiduciary duties.

76.     As alleged above, the scope of the fiduciary duties and responsibilities of Defendants included managing the assets of the Plan with the care, skill, diligence, and prudence required by ERISA.  Defendants were and are directly responsible for, among other things, selecting only prudent investments for Plan assets, eliminating imprudent investments, determining how to invest employer contributions to the Plan and directing the Trustee regarding the same, evaluating the merits of the Plan's investment on an ongoing basis, administering the operations of the Trust and taking all necessary steps to ensure that the Plan's assets were invested prudently.

77.     According to DOL regulations and case law interpreting this statutory provision, a fiduciary's investment or investment course of action is prudent if: (a) he has given appropriate consideration to those facts and circumstances that, given the scope of such fiduciary's investment duties, the fiduciary knows or should know are relevant to the particular investment or investment course of action involved, and (b) he has acted accordingly.

78.     Defendants had a duty to follow a regular, appropriate systematic procedure to evaluate the prudence of maintaining Lifetouch stock as the investment under the Plan.  Defendants failed to conduct an appropriate investigation of the merits of continued investment in Lifetouch stock.  Such an investigation would have revealed to a reasonably prudent fiduciary the

imprudence of continuing to make and maintain investments in Lifetouch stock under the prevailing circumstances of this case. More specifically:

> a.    A reasonably prudent fiduciary needs to monitor all investments held by the Plan, but particularly an investment that, like here, is the only investment held by the Plan.

> b.    A reasonably prudent fiduciary would have carefully monitored Lifetouch stock to ensure that it remained a prudent retirement investment for Plan participants. *See Tibble v. Edison*, 135 S. Ct. 1823, 1829 (2015).

> c.    A reasonably prudent fiduciary would have carefully monitored Lifetouch stock to ensure that it adhered to its purported investment purpose as described to Lifetouch employees both under the terms of the Plan and in the Summary Plan Description.

> d.    A reasonably prudent fiduciary would have removed Lifetouch stock as a Plan investment if it were no longer a prudent retirement investment for Plan participants. *See Tibble*, 135 S. Ct. at 1829.

> e.    A reasonably prudent fiduciary would have provided truthful, clear and timely warnings to Plan participants regarding the imprudence Lifetouch stock.

79.    Nonetheless, during the Class Period, these Defendants continued to permit the Plan to invest in Lifetouch stock and to remain invested in Lifetouch stock.

80.    In addition, upon information and belief, it appears that Defendants lacked *any* procedures and processes for conducting regular monitoring and evaluation of the prudence of the Plan's investment.  This complete lack of procedures and processes constitutes a dereliction of

Defendants' fiduciary duty of prudence separate and apart from the disastrous harm caused by the Plan's continued investment Lifetouch stock.

81.    The foregoing breaches of duty entitle Plaintiff to relief under ERISA.

## SECOND CAUSE OF ACTION
### (Breach of Duty to Monitor – Against Board Defendants)

82.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

83.    At all relevant times, as alleged above, the Board Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

84.    At all relevant times, as alleged above, the scope of the fiduciary responsibility of the Board Defendants included the responsibility to appoint, evaluate, and monitor other Plan fiduciaries, including, but not limited to, the Trustee.

85.    The Board Defendants breached their fiduciary monitoring duties during the Class Period when the fiduciary they were tasked with monitoring, the Trustee, failed to take action to protect Plan participants from the inevitable harm that would be caused by the imprudence of Lifetouch stock.   The Board Defendants should have recognized, based on their intimate knowledge of the operational and fiscal challenges facing Lifetouch and their control over the data submitted to the Trustee to make its annual determination of the value of Lifetouch stock, that Lifetouch stock had become an imprudent investment for the Lifetouch employees to whom the Board Defendants owed their fiduciary duties.

86.    During 2015 and 2016, Lifetouch stock was overvalued.   In 2017, the value of Lifetouch stock had dropped by 36% and was certain to experience further declines due to the Company's worsening cash flow problems and impending acquisition.   The Board Defendants could have amended the Plan to remove Lifetouch stock as the Plan's investment vehicle for Plan

25

assets, divested the Plan of its Lifetouch stock holdings, and/or disclosed the imprudence of Lifetouch stock to Plan participants; they could have recommended that the Trustee take one or more of those actions, and if the Trustee failed to do so, they could have removed or replaced the Trustee from its fiduciary role.  The failure of the Board Defendants to take any of these actions constituted a breach of their fiduciary duties.

87.     As a direct and proximate result of these breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and other Plan participants, suffered foreseeable damage to and/or lost a significant portion of their retirement investments.  Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), the Board Defendants are liable to restore the losses to the Plan caused by their breaches of their fiduciary duties.

### THIRD CAUSE OF ACTION
### (Breach of Duty of Loyalty – Against Board Defendants)

88.     Plaintiff incorporates by reference the paragraphs above.

89.     During the Class Period, the Board Defendants were and are ERISA fiduciaries.

90.     The Board Defendants were obligated to ensure that all of the Plan's assets were loyally managed pursuant to these duties.

91.     As alleged above, the Board Defendants were directly responsible for, among other things, managing the assets of the Plan for the sole and exclusive benefit of participants as required by ERISA.

92.     The duty of loyalty requires a fiduciary to avoid conflicts of interest and to resolve them promptly when they occur.  A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or of the plan sponsor.

26

93.     The Board Defendants had a duty to avoid conflicts of interest, yet instead they used Plan assets to financially enrich retiring senior executives, including fellow Board member and former CEO Paul Harmel.  The Board Defendants caused Lifetouch stock to become and remain overvalued during 2015 and 2016 when many senior executives were retiring from Lifetouch and receiving distributions for the value of the Lifetouch stock held in their Plan accounts, including Defendant Harmel.  Defendant Harmel retired as CEO in July of 2016, just following the Company stock valuation but before it subsequently lost 36% of its value.

94.     These foregoing breaches of duty entitle Plaintiff to relief under ERISA.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for:

1.      A Declaration that Defendants have breached their ERISA fiduciary duties to Plaintiff and other similarly situated Plan participants;

2.      An Order compelling Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including loss of vested benefits to the Plan resulting from imprudent investment of the Plan's assets; to restore to the Plan all profits Defendants made through use of the Plan's assets; and to restore to the Plan all profits which the Plan and participants would have made if Defendants had fulfilled their fiduciary obligations;

3.      Imposition of a constructive trust on any amounts by which Defendants were unjustly enriched at the expense of the Plan as the result of breaches of fiduciary duty;

4.      An Order enjoining Defendants from any further violations of their ERISA fiduciary obligation;

5.      An Order requiring the Board Defendants to appoint one or more independent fiduciaries to participate in the management of the Plan's investments;

6.    Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

7.    An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

8.    An Order awarding attorneys' fees pursuant to the common fund doctrine, 29 U.S.C. § 1132(g), and other applicable law; and

9.    An Order for equitable restitution and other appropriate equitable and injunctive relief against Defendant.

## DEMAND FOR JURY TRIAL

Plaintiff and the Class request a jury trial for any and all Counts for which a trial by jury is permitted by law.

DATED: March 1, 2018

By: */s/ Douglas J. Nill*
   Douglas J. Nill (# 0194876)

**Douglas J. Nill, PLLC**
**d/b/a FarmLaw**

2050 Canadian Pacific Plaza
120 South Sixth Street
Minneapolis, MN  55402-1801
Telephone:  (612) 573-3669
Facsimile:  (612) 330-0959
*dnill@farmlaw.com*

*Counsel for Plaintiff and the Putative Class*


**ZAMANSKY LLC**

Jacob H. Zamansky*
Samuel E. Bonderoff*
Edward H. Glenn, Jr.*
Justin Sauerwald*
50 Broadway, 32nd Floor
New York, NY  10004
Telephone:  (212) 742-1414
Facsimile:   (212) 742-1177
*jake@zamansky.com*

**pro hac vice* application forthcoming

*Additional Counsel for Plaintiff and the Putative Class*