## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Deborah Vigeant, Rhonda Wood, Elizabeth Millane, Douglas Eckelbecker, Amanda Eckelbecker, Rodney Uting, Lawrence Anderson, and all other individuals similarly situated,<br><br>               Plaintiffs,<br><br>vs.<br><br>Michael Meek, Paul Harmel, P. Robert Larson, Donald Goldfus, John Anderson, Bruce Nicholson, Bernie Alrich, Ted Koenecke, Glenn Elo, Newport Trust Company, and Lifetouch Inc.,<br><br>               Defendants. | Case No. 0:18-cv-00577-JNE-TNL |

## DEFENDANTS MICHAEL MEEK, PAUL HARMEL, P. ROBERT LARSON, DONALD GOLDFUS, JOHN ANDERSON, BRUCE NICHOLSON, BERNIE ALRICH, TED KOENECKE, GLENN ELO, AND LIFETOUCH INC.'S MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS THE AMENDED COMPLAINT

## INTRODUCTION

Plaintiffs are current and former participants in an Employee Stock Ownership Plan ("ESOP") sponsored by their employer, Lifetouch Inc. ESOPs are a unique type of pension plan that invests in the stock of the company that employs the plan participants. Congress authorizes ESOPs as a way for employees to share in their employer's long-term growth, while saving for retirement. Of course, the value of the employer's stock (and thus the employees' savings) depends on the success of the company.

Plaintiffs complain that their ESOP retirement accounts lost money over the last three years as Lifetouch faced business challenges and its assessed value declined. For that loss, Plaintiffs blame the ESOP's trustees who valued the stock, along with Lifetouch and its Board of Directors who appointed the trustees. Plaintiffs claim all these Defendants had a fiduciary duty under ERISA to prevent the loss to their ESOP accounts. Each of Plaintiffs' claims is misguided and should be dismissed.

First, Plaintiffs fail to state a claim by alleging in Count I that Lifetouch stock was "overvalued" in 2015 and 2016. Plaintiffs point to no flaw in the valuation process. They simply allege that the 2015 and 2016 valuations must have been wrong because the 2017 valuation was lower. But all stock value fluctuates, and ERISA does not require fiduciaries to predict future adverse business conditions. Moreover, the drop in Lifetouch's value over the putative class period is consistent with Plaintiffs' own allegation that Lifetouch was under "economic strain"—it does not suggest a flaw in the 2015 or 2016 valuations.

Second, Plaintiffs fail to state a claim by alleging in Count I that Lifetouch stock was *under*valued in 2018 when the company was sold to Shutterfly, Inc. Plaintiffs do not

cite a single fact suggesting that the 2018 valuation was too low.  To the contrary, they acknowledge that a third-party independent trustee, Newport Trust Company, approved the Shutterfly transaction.  Nothing suggests that Newport's approval was improper.

Third, apart from valuation issues, Plaintiffs also vaguely allege in Count I that Defendants should have done something to avoid the drop in Lifetouch's value between 2015 and 2018.  This too fails to state a claim.  All Plaintiffs allege is that the value dropped due to market forces.  As courts recognize, a mere drop in an employer's share price does not trigger an obligation to sell an ESOP's stock.  A contrary rule would make ESOPs impossible to administer or sponsor, as it would require fiduciaries to predict the employer's future fortunes (an impossible task) or face a breach of fiduciary duty claim.

Fourth, Plaintiffs do not save their Complaint by adding a "duty of loyalty" claim in Count III.  Again, Plaintiffs allege no facts suggesting that Defendants engaged in any malfeasance with respect to Lifetouch's stock valuation.  And Plaintiffs offer nothing but conclusory statements than any Defendant did anything disloyal.  Plaintiffs allege nothing to suggest that Lifetouch or its Board of Directors interfered with the valuations, or that any senior executives were improperly enriched.

## BACKGROUND

### A.    Lifetouch sponsored an Employee Stock Ownership Plan.

Lifetouch is a Minnesota company that has provided professional photography services since 1936.  Am. Compl. ("AC") ¶ 4.  Until its recent sale to Shutterfly, Lifetouch was 100% owned by its employees, and had been for decades.  *Id.*

Lifetouch's employee ownership was achieved through an ESOP sponsored by Lifetouch (the "Plan"). *Id.* ¶ 8. Authorized by Congress, ESOPs are "designed to invest" in stock of the sponsoring employer (in this case, Lifetouch). 29 U.S.C. § 1107(d)(6)(A). Like all ESOPs, the Plan served two related purposes—to give employees a stake in the company's long-term growth and provide a source of retirement savings. AC ¶ 45.[1]

During the class period, the Plan held 100% of Lifetouch's stock. *See id.* ¶¶ 4, 55, 99(a). That ownership structure was consistent with Lifetouch's corporate charter, which required that all Lifetouch stock be owned by current employees and/or the Plan. *Id.* ¶ 55.

The Plan held the stock in a trust. *Id.* ¶ 47. Lifetouch's Board of Directors appointed a trustee ("Trustee"), which had exclusive authority to manage the Plan assets in the trust. *Id.* ¶ 50. According to the Complaint, Defendants Ted Koenecke and Glenn Elo served as Trustee "through May 2017," at which point Newport[2] became Trustee. *Id.* ¶¶ 41-43.

## B. Lifetouch stock was valued, distributed to employees, and reinvested in the company.

After completing 700 hours of service, an employee could become a participant in the Plan and start accumulating interest in Lifetouch stock pursuant to a set formula. Decl. of Timothy P. Ryan Ex. A ("**Plan**") § 3(a).[3] Like participants in a 401(k) plan, Plan

---

[1] *See Fifth Third Bancorp v. Dudenhoeffer*, 134 S.Ct. 2459, 2468-69 (2014) (ESOPs "maximize retirement savings" and "promote employee ownership of employer stock").

[2] According to the Complaint, Evercore Trust Company was Trustee as of "May 2017," but its assets were acquired by Newport "as of October 18, 2017." AC ¶ 43.

[3] "The Court may consider plan documents relating to Plaintiffs' plans because they are necessarily embraced by the pleadings." *In re UHG PBM Litig.*, 2017 U.S. Dist. LEXIS 208328, at *16 n.2 (D. Minn. Dec. 19, 2017) (Ericksen, J.).

participants had individual accounts.  Plan § 7(a).  The stock that participants earned was (nominally) allocated among their individual accounts.  *Id*. § 7(b).

A participant could request distributions from her account when she left Lifetouch's employment.  AC ¶¶ 55, 77.  When that occurred, the Plan had an obligation to distribute the value of the stock in the participant's account.  *See id.*  The Plan would typically satisfy this repurchase obligation with cash contributions from Lifetouch.  *See* Plan §§ 6(a), 14, 16(a).[4]  The Plan would make distributions to the former employee over at least three years, and it would reallocate the former employee's shares among the other participants.  Plan § 7(c), § 14(a)(1).  The shares never left the hands of employees and the Plan, as required by Lifetouch's charter "restrict[ing]" ownership to employees and the Plan.  AC ¶ 55.

Because Lifetouch was a private company, its share price could not be determined from publicly-traded markets.  For that reason, the Plan required the Trustee to value Lifetouch stock on an annual basis as of June 30.  *Id.* ¶ 54; Plan § 16(a).  The Trustee relied on the "opinion of an Independent Appraiser" in valuing the stock.  AC ¶ 54.  The Trustee would then use the annual valuation when making distributions to retired participants.  *Id.* ¶ 55; Plan §§ 14(f), 16(a).  For example, if a participant retired and sought a distribution in November 2016, the Trustee would look to the June 2016 valuation for the value of that participant's shares.  *See* AC ¶ 55.

---

[4] On occasion, the repurchase obligations exceeded IRS annual contribution limits. When that occurred, the Plan allowed Lifetouch itself (rather than the Plan) to redeem participant stock in return for cash.  *See* Plan § 16(a)-(b).

As noted, the Trustee relied on the "opinion of an Independent Appraiser" in valuing Lifetouch stock. *Id.* ¶ 54. There is no allegation that the Independent Appraiser had any incentive to inflate the stock's value. Nor is there any allegation that the Trustee ever interfered with or ignored the Appraiser's findings.

Like any stock, the value of Lifetouch stock changed as the performance and outlook of the company changed. *See id.* ¶ 58. Plan communications, therefore, advised participants that Lifetouch stock would "gain or lose value based on the financial performance of the company." Decl. of Timothy P. Ryan Ex. B § 3(a), Ex. C § 3(a).

### C.    The value of Lifetouch stock declined as the company faced challenges.

According to the Complaint, Lifetouch faced business challenges between 2015 and 2018 as "digital age" technology transformed the professional photography industry. AC ¶ 75. Among other things, the wide availability of digital cameras changed consumer tastes. *Id.* Instead of having "portraits adorning the walls and bookshelves stuffed with photo albums," customers now snap pictures with the "camera[s] right in their pocket." *Id.*

In 2015, Lifetouch allegedly "began to feel the economic strain" from these challenges. *Id.* Lifetouch closed J.C. Penney and Target brick-and-mortar portrait studios. *Id*. To further address financial pressure, Lifetouch closed a production facility in North Carolina in November 2015, losing 206 employees. *Id.*

During this period of "economic strain," the value of Lifetouch stock—as assessed by the Trustee and Independent Appraiser—declined. *Id.* ¶ 58. In 2015, the value of Lifetouch stock was $93 per share, a 10% drop from 2014. *Id.* In 2016, the value was $88

per share, a 5% drop from 2015. *Id.* And in 2017, the value was $56 per share, a 36%
decrease from 2016. *Id.*

### D.   Shutterfly acquired the Plan's shares of Lifetouch stock.

Lifetouch's challenges continued through 2017 as it "wasn't growing fast enough
to generate sufficient cash flow to invest in new technology and in other ways in the
business." AC ¶ 66. Around August 2017, Lifetouch and Shutterfly, an internet-based
photography company, allegedly initiated negotiations about a potential sale of Lifetouch.
*Id.* ¶ 68. Their negotiations culminated on January 30, 2018, when Shutterfly announced
its agreement to purchase all of Lifetouch's stock. *Id.* ¶ 70.

Newport represented the Plan's trust in the Shutterfly transaction. *Id.* ¶¶ 43, 67.
After receiving a fairness opinion from a third-party financial advisor, Newport reviewed
and approved the sale price to Shutterfly. *Id.* ¶ 70. Although the Complaint alleges that
the sale price ($825 million) reflected a 17% drop in Lifetouch's value since June 30, 2017
(*id.* ¶ 70), documents embraced by the pleadings demonstrate that this allegation is
implausible—the actual sale price was significantly greater. *See infra* at 14 n.10; *see also*
Def. Newport's Memo. of Law in Supp. of Mot. to Dismiss (ECF No. 56).

The Plan has been terminated and has commenced distribution of the proceeds of
the Shutterfly acquisition to participants. *See* AC ¶ 71.

### E.   Plaintiffs and their claims.

Plaintiffs are Deborah Vigeant, Rhonda Wood, Elizabeth Millane, Douglas
Eckelbecker, Amanda Eckelbecker, Rodney Uting, and Lawrence Anderson. AC ¶¶ 26-

32. Over the years, these Plaintiffs participated in the Plan and accumulated an interest in Lifetouch stock in their individual ESOP accounts. *Id.*

Plaintiffs bring this putative class action on behalf of Plan participants who were invested in Lifetouch stock from June 30, 2015, until present. *Id.* ¶ 1. In Count I, Plaintiffs allege that Trustees Koenecke and Elo breached their ERISA duty of prudence when they "overvalued" Lifetouch stock "in 2015 and 2016." *Id.* ¶¶ 11, 56. At the same time, Plaintiffs allege that Trustee Newport *under*valued Lifetouch stock when it approved the sale to Shutterfly in 2018. *Id.* ¶¶ 56, 70. Plaintiffs do not challenge the 2017 valuation.

Apart from valuation issues, Plaintiffs also allege that the Trustees should have done something to avoid the Plan's losses between 2015 and 2018. They allege, for example, that the Trustees should have "divested the Plan out of Lifetouch stock" because its value was "in rapid decline" and Lifetouch faced future business risks. *Id.* ¶¶ 11, 62.

In addition to the Trustee, Plaintiffs assert claims against Lifetouch and members of its Board of Directors (the "Director Defendants")[5] in Counts I, II, and III. *Id.* ¶¶ 100, 104, 110. Although the Director Defendants were responsible for appointing the Trustees (*id.* ¶ 73), there is no allegation that they failed in this responsibility, nor is there any allegation that they had fiduciary responsibility over the annual valuation or the Plan's investments. *Id.* ¶ 99; *see also id.* ¶ 64 ("the Trustee determines the value of Lifetouch shares"). Lifetouch itself had no fiduciary connection to the Plan's investments at all.

---

[5] The Director Defendants are Michael Meek, Paul Harmel, P. Robert Larson, Donald Goldfus, John Anderson, Bruce Nicholson, and Bernie Alrich. AC ¶¶ 34-40.

Finally, Count III alleges that Lifetouch and the Director Defendants breached their ERISA duty of loyalty because they "caused and allowed" the overvaluation of Lifetouch stock in order to "enrich retiring senior executives." *Id.* ¶ 115. Plaintiffs fail to make any allegations sufficient to support this claim.

## <u>LEGAL STANDARD</u>

To survive a motion to dismiss, a complaint must offer "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A complaint is "plausible" only if it contains enough "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In *Fifth Third Bancorp v. Dudenhoeffer*, the Supreme Court outlined a court's task in separating the "plausible sheep" from the "meritless goats" in a breach of fiduciary duty action under ERISA. 134 S.Ct. 2459, 2470-71 (2014). That task requires "careful, context-sensitive scrutiny" of a plaintiff's allegations based on "the circumstances . . . prevailing at the time the fiduciary act[ed]." *Id.* (quoting 29 U.S.C. § 1104(a)(1)(B)). The "appropriate inquiry" is on what the fiduciary knew at the time in question—not on what is known in hindsight. *Id.*; *see also Roth v. Sawyer-Cleator Lumber Co.*, 16 F.3d 915, 918-19 (8th Cir. 1994) (ERISA's fiduciary standard "is not concerned with results" but "focuses on the fiduciary's conduct preceding the challenged decision"); *Meiners v. Wells Fargo & Co.*, 2017 U.S. Dist. LEXIS 80606, at *4 (D. Minn. May 25, 2017) (same).

Accordingly, to state a fiduciary breach claim, a plaintiff must "plausibly" allege that the fiduciary's "decision making process was flawed." *Braden v. Wal-Mart Stores,*

*Inc.*, 588 F.3d 585, 595 (8th Cir. 2009).  Because this standard "focuses on the fiduciaries' conduct preceding a challenged decision, rather than the results," a plaintiff cannot state a claim by alleging "from the vantage point of hindsight" that fiduciaries could have better managed an ESOP's investments.  *In re Target Corp. Sec. Litig.*, 275 F.Supp.3d 1063, 1083 (D. Minn. 2017) (Ericksen, J.) (quotations omitted); *see also In re Citigroup ERISA Litig.*, 662 F.3d 128, 140 (2d Cir. 2011) (same).

Finally, given the difficulty in valuing ESOP privately-held stock, courts review such valuations "deferentially."  *Armstrong v. LaSalle Bank Nat'l Ass'n*, 446 F.3d 728, 733 (7th Cir. 2006) (ERISA does not seat ESOP fiduciaries on a "razor's edge"); *see also Kool v. Coffey*, 300 F.3d 340, 362-63 (3d Cir. 2002) (acknowledging "the extremely difficult task of valuing the stock of a company which is privately owned").

## ARGUMENT

### I.      Plaintiffs Fail to State A Breach of Prudence Claim Based On The Valuation Of Lifetouch Stock (Count I – All Defendants).

Plaintiffs' fail to plausibly allege in Count I that any Defendant breached an ERISA duty of prudence in connection with the 2015, 2016, or 2018 valuations of Lifetouch stock. There is no plausible allegation that the Trustee Defendants, whom Plaintiffs acknowledge were responsible for the valuations, used an improper valuation process.  And Plaintiffs allege no facts suggesting that the Director Defendants or Lifetouch were responsible for the valuation or otherwise breached any duty with respect to the valuations.

### A. Plaintiffs do not plausibly allege that the Trustee Defendants misvalued Lifetouch's stock.

Plaintiffs do not plausibly allege in Count I that the Trustee (i) overvalued Lifetouch stock in 2015 and 2016 or (ii) undervalued the stock when it was sold to Shutterfly in 2018.

### 1. There is no plausible allegation that the Trustee overvalued Lifetouch stock in 2015 or 2016.

To state a claim that the Trustee overvalued Lifetouch stock in 2015 or 2016, Plaintiffs must plausibly allege that the valuation process itself "was flawed." *Braden*, 588 F.3d at 595-97. That showing can be made with allegations directly about the valuation process, or with allegations that indirectly but plausibly suggest a flawed process. *Id.* However, an inference of wrongdoing does not arise from facts that "one would expect from lawful conduct in which the defendant is known to have engaged." *Id.*; *see, e.g.*, *Meiners*, 2017 U.S. Dist. LEXIS 80606, at *6 (dismissing prudence claim based on results "one would expect" from lawful conduct). The Complaint does not meet this standard.

As an initial matter, Plaintiffs do not directly criticize the Trustee's valuation process. Rather, their description of that process suggests it was sound and prudent. *See* AC ¶¶ 56-60. Plaintiffs admit the Trustee valued the stock with the "opinion of an Independent Appraiser," whose qualification and method they do not question. *Id.* ¶ 54. They do not claim the Independent Appraiser had any incentive to inflate the stock, nor do they allege that the Trustee interfered with or ignored the Appraiser's findings. And they admit the Trustee followed the *same* valuation process in 2017 and reached a correct

valuation. *See id.* ¶ 56 (not questioning 2017 valuation).[6] These allegations describe a sound and prudent valuation process, which is fatal to Plaintiffs' claims. *See White v. Chevron Corp.*, 2016 U.S. Dist. LEXIS 115875, at *45 (N.D. Cal. Aug. 29, 2016) (dismissing ERISA prudence claim when allegations suggested proper process).[7]

In this context, Plaintiffs fail to raise an inference of poor process with allegations that: (1) Lifetouch's value fell in 2017; (2) the company was generally under "economic strain"; and (3) unidentified executives retired in 2015 and 2016. AC ¶¶ 58-59, 75.

First, Plaintiffs' allegation that the stock value fell in 2017 does not plausibly suggest that the stock was overvalued in 2015 and 2016. Rather, this is exactly the sort of hindsight-based claim that courts have rejected. *See Roth*, 16 F.3d at 918 (prudence not evaluated from the "vantage point of hindsight"). The mere fact that the stock's value dropped in 2017 when the company faced "dire" economic circumstances (AC ¶ 20) does not suggest that the prior 2015 and 2016 valuations were inappropriate. All stock value fluctuates. If a price drop in itself suggested a flaw in a prior valuation, then a plaintiff

---

[6] Plaintiffs' musing that "perhaps the stock price would not have been" the same in 2015 or 2016 had the Trustee "utilized" other "resources" (AC ¶ 57) does not move the plausibility meter as Plaintiffs do not identify these additional "resources" or what impact they would have had on the valuation. *See Barchock v. CVS Health Corp.*, 886 F.3d 43, 53-54 (1st Cir. 2018) ("pure speculation" cannot state ERISA prudence claim).

[7] *Cf. Allen v. GreatBanc Tr. Co.*, 835 F.3d 670, 679 (7th Cir. 2016) (viable valuation claim due to plausible inference that trustee "did not rely on an unbiased, independent assessment, nor did it use an assessment that started with a trustworthy benchmark"); *Armstrong*, 446 F.3d at 733-34 (same due to "obvious" omissions); *Martin v. Feilen*, 965 F.2d 660, 671 (8th Cir. 1992) (same due to "reprehensible self-dealing"); *Donovan v. Cunningham*, 716 F.2d 1455, 1473 (5th Cir. 1983) (same due to "obvious" errors in "critical assumptions" underlying valuation).

11

could state a claim whenever a company faced a downward trend. Here, however, a drop in Lifetouch's stock value is the "result one would expect" given Plaintiffs' allegation that Lifetouch faced diminishing economic prospects beginning in 2015. *Braden*, 588 F.3d at 597; *see also Citigroup*, 662 F.3d at 140 (rejecting allegation that stock was "inflated" because a plaintiff "cannot rely, after the fact, on the magnitude of the decrease in the" stock to state a claim).

In fact, Plaintiffs' allegations about the valuations are internally inconsistent. According to Plaintiffs, the 2017 valuation, which was proper and prudent, somehow "suggest[s]" that the valuation adjustments in 2015 and 2016 were too small. AC ¶ 59. But Plaintiffs fail to explain why the 2017 valuation process—with the same Independent Appraiser—delivered a correct 2017 value, but incorrect 2015 and 2016 values. Instead, Plaintiffs cherry pick valuations that support their narrative, excluding the others.

Second, Plaintiffs' vague allegation that Lifetouch was under "economic strain" (AC ¶ 75) does not suggest that the 2015 or 2016 valuations were flawed. Nothing in the Complaint suggests the Trustee had reason to believe the valuations did not reflect Lifetouch's value. Plaintiffs do not identify any incorrect information or methodology used by the Independent Appraiser (and thus the Trustee) when valuing Lifetouch stock. There is no allegation, for example, that the Appraiser relied upon incorrect revenue, profit, or growth information. All Plaintiffs offer is a vague allegation that Lifetouch was under "economic strain," which says nothing about whether the valuations accounted for what the Trustee knew of that decline at the time. *See, e.g.*, *Target*, 275 F.Supp.3d at 1088 (rejecting ERISA prudence claim that "rest[ed] on hindsight").

12

Finally, Plaintiffs' allegation that some unidentified "senior executives" retired in 2015 and 2016 does not plausibly suggest overvaluation.  Though Plaintiffs allege that "[m]ultiple senior executives . . .  began to retire over the course of 2015 and 2016," the only executive they identify who retired was Lifetouch's CEO, Paul Harmel.  AC ¶¶ 75, 77.  It is not plausible to allege that the Trustee's valuations were imprudent because one executive retired over a two-year period.  And even if the Court credits Plaintiffs' conclusory allegation that other (unidentified) executives retired during this period, such retirements do not suggest that the Independent Appraiser misvalued the stock.[8]

In sum, Plaintiffs fail to allege any facts that plausibly suggest Lifetouch stock was "overvalued" in 2015 or 2016.

> **2.     There is no plausible allegation that the Trustee undervalued Lifetouch stock in connection with the Shutterfly acquisition.**

Plaintiffs' allegations are even more deficient with respect to the 2018 valuation of Lifetouch stock in connection with the sale to Shutterfly.  They allege nothing that suggests that valuation was improper or imprudent.  *See* AC ¶ 70.

As an initial matter, this undervaluation claim cannot proceed against Defendants Koenecke and Elo because their service as Trustee ended "May 2017."  AC ¶¶ 41-43.  They cannot be responsible for a breach that may have occurred after that date, including the

---

[8] While Plaintiffs allege that Lifetouch fraudulently manipulated the number of customers it served (AC ¶ 61), this barebones allegation does not comply with Rule 8, let alone Rule 9(b)'s stringent restrictions on allegations of fraud.  *See In re Xcel Energy, Inc.*, 312 F.Supp.2d 1165, 1179 (D. Minn. 2004) ("Plaintiffs are required to plead with particularity when the alleged breach of the fiduciary is the fraudulent act.").  Plaintiffs do not allege the "who, what, where, when, and why" of the alleged fraud, nor do they explain how it inflated Lifetouch's revenue or affected its stock value.  *See* AC ¶ 61.

Shutterfly acquisition, which closed in 2018.  *See* 29 U.S.C. § 1109(b) ("No fiduciary shall be liable with respect to a breach [that occurred] after he ceased to be a fiduciary").

Nor can this claim proceed against any other Defendant.  As with the 2015 and 2016 valuations, Plaintiffs do not allege any flaw in the process by which the stock was valued during the sale to Shutterfly.  *See* AC ¶ 70.  To the contrary, Plaintiffs admit and "Independent Appraiser" provided a fairness opinion in connection with the Shutterfly acquisition, and that Newport—and independent, third-party trustee—approved the transaction.  *Id.*  In other words, Plaintiffs allege nothing improper about the method used by the Independent Appraiser or Newport.[9]

Moreover, Plaintiffs cannot state a claim by alleging that the value of the company fell 17% between June 2017 and January 2018.  As noted, that allegation is implausible because it is contradicted by documents embraced by the Complaint.  *See supra* at 6.  Those documents demonstrate that Lifetouch's sale price was $825 million *plus* the cash held by Lifetouch.  The final purchase price is expected to be well over $900 million, significantly greater than the $825 million alleged in the Complaint.[10]

---

[9] Plaintiffs once again theorize that the Trustee should have "engage[d] other professionals" in the process, but again, fail to allege why "other professionals" would have made any impact on the Independent Appraiser's assessment.  AC ¶ 70.

[10] Specifically, the Shutterfly-Lifetouch purchase agreement, which is embraced by the Complaint (AC ¶ 71) and publically filed with the SEC, shows that the purchase price was $825 million *plus* the sum of Lifetouch's cash and cash equivalents.  Decl. of Nicholas J. Bullard ¶ 3, Ex. A at 6 (specifying "Consideration").  Other public SEC filings show that the anticipated purchase price was over $900 million.  *Id.* ¶ 4, Ex. B at 3 (preliminary purchase consideration).  Thus, there is no plausible basis for Plaintiffs' claim that the $825 million purchase price reflected a 17% drop in value.  *See Markewich v. Collins*, 622

Regardless, Plaintiffs' "17% drop" allegation, even if accepted, does not suggest that the 2018 valuation was incorrect.  Apart from the drop itself, Plaintiffs plead nothing to suggest that the 2018 valuation was flawed.  Again, Plaintiffs' own allegations provide a plausible explanation for that drop (assuming it occurred).  According to the Complaint, Lifetouch's business opportunities diminished every year through 2018.  AC ¶¶ 6, 12, 20.  Given that, "one would expect," or at least would not be surprised, that Lifetouch's value fell between 2017 and 2018.  *Braden*, 588 F.3d at 597; *see Meiners*, 2017 U.S. Dist. LEXIS 80606, at *6 (dismissing ERISA prudence claim based on results "one would expect").

In sum, Plaintiffs fail to state a claim by speculating that Lifetouch stock was overvalued in the Shutterfly acquisition.  And if the Court grants Newport's motion for lack of standing to challenge the acquisition, that ruling should apply to all Defendants.  *See* Def. Newport's Memo. of Law in Supp. of Mot. to Dismiss (ECF No. 52).

### B.      Plaintiffs do not plausibly allege that the Director Defendants or Lifetouch breached a duty of prudence with respect to stock valuations.

Even if Plaintiffs had stated a claim against the Trustee for its valuation of Lifetouch stock (they have not), they still fail to plead facts plausibly suggesting that Lifetouch or the Director Defendants breached a duty of prudence with respect to those valuations.  *See also infra* at 26-27 (no plausible failure to monitor the Trustee claim).

---

F.Supp.2d 802, 806 (D. Minn. 2009) ("public filings required to be filed with the SEC, can be considered on a motion to dismiss") (quotation omitted).

1.    **The Director Defendants and Lifetouch had no fiduciary responsibility over stock valuations.**

It is axiomatic under ERISA that a fiduciary may be liable only for responsibilities specifically entrusted to her.  *See* 29 U.S.C.S. § 1105(c)(2); *Peagram v. Herdrich*, 530 U.S. 211, 225-26 (2000) (party is an ERISA fiduciary "only to the extent that he acts in such a capacity"); *Walker v. Nat'l City Bank*, 18 F.3d 630, 633 (8th Cir. 1994) ("named fiduciaries will not be liable for acts and omissions properly allocated to other fiduciaries").

Here, Plaintiffs admit the Trustee alone "was responsible for determining the value of Lifetouch stock."  AC ¶ 11; *see also* Plan §§ 6(b), 16(a).  Thus, they do not, and cannot, allege that Lifetouch or the Director Defendants could be primarily liable for improper valuation of, or failure to monitor, Lifetouch stock.  *See, e.g.*, AC ¶ 60 ("the shares were overvalued by the Trustee").  This is fatal to Plaintiffs' claims against Lifetouch and the Director Defendants.  *See Pegram*, 530 U.S. at 225.

2.    **There is no plausible allegation of a "failure to disclose."**

Plaintiffs attempt to avoid this conclusion by suggesting that the Director Defendants or Lifetouch breached a duty to disclose Lifetouch's allegedly dire economic forecast to the Trustee.  *See* AC ¶ 78.  This theory fails.  As discussed, Plaintiffs do not allege that these Defendants possessed information that the Independent Appraiser's valuation was wrong or that the Appraiser lacked sufficient data to make a proper valuation.  All Plaintiffs allege is that the Director Defendants "evidentially withheld" unidentified information from the Trustee.  AC ¶ 78.  Even under Rule 8's pleading standard, the allegation that the Director Defendants should have predicted future stock value drops is

exactly the sort of speculative, hindsight-based claim that does not state a claim.  *See* Fed. R. Civ. P. 9(b);[11] *see also Twombly*, 550 U.S. at 555 (claim must rise "above the speculative level"); *Barchock*, 886 F.3d at 53-54 (dismissing ERISA prudence claim based on "pure speculation").

In any event, Plaintiffs' disclosure claim fails because "ERISA does not impose a duty on [ESOP] appointing fiduciaries to keep their appointees apprised of nonpublic information" about the company, even if it might inform the ESOP trustee's decisions. *Target*, 275 F.Supp.3d at 1093 (quoting *Rinehart v. Lehman Bros. Holdings Inc.*, 817 F.3d 56, 68 (2d Cir. 2016)).  This is true even in the context of privately-held ESOPs, where courts recognize that a corporate insider does not violate ERISA by failing to disclose information about the company's future business prospects to an ESOP fiduciary.  *See Fish v. Greatbanc Tr. Co.*, 2016 U.S. Dist. LEXIS 137351, *170-71 & n.24 (N.D. Ill. Sep. 1, 2016) (questioning a "duty to inform" and "reject[ing] a rigid distinction between the standards of prudence applicable to public companies and closely-held ones").  Again, Plaintiffs fail to allege that the Director Defendants or Lifetouch breached any duty to apprise the Trustee of information about Lifetouch's future prospects.

---

[11] This omission claim must be pled with the particularity required by Fed. R. Civ. P. 9(b).  *See Xcel Energy*, 312 F.Supp.2d at 1179 ("Plaintiffs are required to plead with particularity when the alleged breach" is "a fraud, misrepresentation or *omission*") (emphasis added).  Plaintiffs do not allege what information was withheld, who withheld it, or when it should have been disclosed.

## II.    Plaintiffs Fail To State A Breach Of Prudence Claim Based On Retention Of Lifetouch Stock As A Plan Investment (Count I – All Defendants).

With no plausible allegation that Lifetouch stock was misvalued, Plaintiffs resort to alleging that the stock was just "too risky an investment" for the Plan.  AC ¶¶ 11, 64.  This theory is implausible.  As an ESOP, the Plan was *designed* to invest in Lifetouch stock and was statutorily exempt from any diversification requirement.  ESOP fiduciaries have no duty to override an ESOP's design and sell its stock just because the sponsor experiences business difficulties that make it stock "riskier."  In any event, Plaintiffs identify *no* plausible action that Defendants could and should have taken to protect participants.

### A.    There is no plausible allegation that maintaining the Plan's investment in Lifetouch stock was improper.

Plaintiffs fail to plausibly allege that Defendants had a duty to breach the Plan's terms to "prevent" it's designed "invest[ment] in Lifetouch stock."  AC ¶ 18.

Rather, Plaintiffs' allegations are inconsistent with the nature of ESOPs, which are "designed to invest" in their sponsor's stock.  29 U.S.C. § 1107(d)(6)(A); *see also* AC ¶ 8 (acknowledging this design).  Given this design, "an ESOP fiduciary is under no duty to diversify the ESOP's holdings," and is therefore "not liable for losses that result from a failure to diversify." *Dudenhoeffer*, 134 S.Ct. at 2467; *see Spires v. Schools*, 271 F.Supp.3d 795, 806 & n.4 (D.S.C. 2017) (same principles apply to private ESOPs).

Because of ESOPs' structure and diversification exemption, ESOP fiduciaries have no duty to sell company stock when the sponsor's business difficulties increase the "risk" of its stock, as alleged here.  Any other rule would effectively require the ESOP to diversity, as there is always risk that the sponsor's business will take a downturn.  Courts therefore

consistently dismiss complaints like this one in which plaintiffs claim ESOP fiduciaries should have sold company stock due to risk in the sponsor's business.  *See, e.g.*, *Vespa v. Singler-Ernster, Inc.*, 2016 U.S. Dist. LEXIS 155048, at *6 (N.D. Cal. Nov. 8, 2016); *Brannen v. First Citizens Bankshares, Inc.*, 2016 U.S. Dist. LEXIS 114775, at *13-14 (S.D. Ga. Aug. 26, 2016); *Hill v. Hill Bros. Constr. Co.*, 2016 U.S. Dist. LEXIS 40225, at *22 (N.D. Miss. Mar. 28, 2016).

For example, the court in *Spires* dismissed a nearly identical claim against a privately-held ESOP.  271 F.Supp.3d at 805-06.  The *Spires* plaintiffs claimed their ESOP fiduciaries breached a duty of prudence by not selling the ESOP's stock when the sponsor was "mismanaged" and its stock declined for eight straight years.  *Id.* at 798, 805.  The court dismissed that claim on a Rule 12 motion.  As the court recognized, plaintiffs were essentially demanding that the ESOP diversify given the sponsor's business risk, but ESOP fiduciaries "are not liable for losses that result from a failure to diversify."  *Id.* at 806.

That same principle requires dismissal of Plaintiffs' prudence claim.  Like the *Spires* plaintiffs, Plaintiffs allege that Lifetouch was under "economic strain" making its stock "risky."  AC ¶ 75.  But as in *Spires* and many other cases, such a risk does not render company stock an imprudent investment for an ESOP.  *See, e.g.*, *Hill*, 2016 U.S. Dist. LEXIS 40225, at *16 (no duty to diversity private ESOP despite sponsor's poor "financial condition").  To the contrary, "[m]ere stock fluctuations" in the ESOP sponsor, "even those that trend downhill significantly, are insufficient to establish the requisite imprudence." *Wright v. Or. Metallurtgical Corp.*, 360 F.3d 1090, 1099 (9th Cir. 2004) (no duty to diversify during 75% drop stock value); *see also Kuper v. Iovenko*, 66 F.3d 1447, 1451,

1459 (6th Cir. 1995) (same during 80% drop).  And indeed, by Plaintiffs' own account, Lifetouch remained a going concern, worth over $800 million in 2018.  *Supra* at 14 n.10.

If Plaintiffs were correct that risk in the sponsor's business mandates divestment of an ESOP's stock, ESOP fiduciaries would be set "on a razor's edge," expected to predict the sponsor's future or face a breach of fiduciary duty claim.  *Armstrong*, 446 F.3d at 733. Such a result would undermine Congress's intent that ESOP should tie the employees' and employer's fortunes together.  *See Dudenhoeffer*, 134 S.Ct. at 2465-66.  And an ESOP would be impossible to administer if employees expected only to share in stock gains, reserving the right to sue fiduciaries anytime the company's business prospects dipped.[12]

Indeed, Plaintiffs' claim fails for another reason—it assumes Defendants had a duty and ability to predict the future performance of Lifetouch stock.  For example, Plaintiffs allege that the Trustee "was already aware" in 2017 that Lifetouch stock would "drop further" in 2018 (AC ¶ 65), but fail to explain how the Trustee could read the future. Plaintiffs know the stock's 2018 value only with the benefit of hindsight, but of course, "hindsight" is the wrong metric for evaluating fiduciary duty.  *Roth*, 16 F.3d at 918.

---

[12] Plaintiffs also ignore their own allegations acknowledging the steps Defendants took to protect participants' investments.  In 2017, Lifetouch began discussions with Shutterfly, which resulted in the sale of the ESOP stock.  AC ¶ 68.  In other words, Defendants took the steps Plaintiffs believe they should have taken.  *See White*, 2016 U.S. Dist. LEXIS 115875, at *45 (dismissing claim when allegations suggested proper process).

Plaintiffs thus fail to allege any facts suggesting that the Trustee had a duty to divest the Plan of its designed investment—Lifetouch stock.[13]

**B.      Plaintiffs fail to plead a plausible alternative action that Defendants could and should have taken.**

Even if Plaintiffs had adequately alleged that Lifetouch stock was "too risky" as a Plan investment, they still do not state a claim.  To state a plausible claim that an ESOP fiduciary improperly maintained investment in company stock, a plaintiff must plausible allege (1) an "alternative action" that the fiduciary could have taken to protect participants' interests that (2) no reasonable fiduciary would have concluded was "more likely to harm the fund than to help it."  *Dudenhoeffer*, 134 S.Ct. at 2471-72; *see Brown v. Medtronic, Inc.*, 628 F.3d 451, 461 (8th Cir. 2010) (rejecting claim where it was "fanciful to believe Medtronic could have taken [proposed] action without [a] much more severe impact").

This standard "is difficult for plaintiffs to meet"; indeed, "no court" since the Supreme Court's decision in *Amgen Inc. v. Harris*, 136 S.Ct. 758 (2016) "has found sufficiently pled alternative actions."  *Graham v. Fearon*, 2018 U.S. App. LEXIS 407, at *21 (6th Cir. Jan. 8, 2018); *e.g.*, *Target*, 275 F.Supp.3d at 1084 (dismissing claim under this standard).  This "alternative action" requirement is an application of *Twombly*/*Iqbal*, *Dudenhoeffer*, 134 S.Ct. at 2471, so courts have applied it to challenges to public and

---

[13] As in Section I.B.1, Plaintiffs fail to allege that the Plan assigned the Director Defendants or Lifetouch any responsibility to review the ongoing prudence of Lifetouch stock.  *See* AC ¶ 50.

private ESOPs alike.  *See, e.g.*, *Hill*, 2016 U.S. Dist. LEXIS 40225, at *21-22 (dismissing challenge to private ESOP where plaintiffs "failed to allege an alternative action").[14]

Recognizing the need to plead a plausible "alternative action," Plaintiffs suggest several actions that Defendants should have taken that would have allegedly avoided loss to Plan participants.  But Defendants either lacked authority to take those actions, or Plaintiffs fail to plausibly allege that the action would have done more good than harm.  Each of Plaintiffs' proposed "alternative actions" fail to pass muster under the "careful, context-sensitive scrutiny" that *Dudenhoeffer* requires.  134 S.Ct. at 2470.

***Sell Lifetouch Stock to Invest in Alternatives.***  Although Plaintiffs allege Defendants should have "divested" the Plan of Lifetouch stock (AC ¶¶ 19, 62-63), this proposed alternative fails for multiple reasons.

First, Plaintiffs ignore their own admission that Lifetouch's charter "restricted" ownership of company stock to employees and the Plan.  AC ¶ 55.  There is, of course, no allegation that Defendants Koenecke and Elo had the power to override the company charter to "divest" the Plan of Lifetouch stock.  Nor is there any allegation that any of the individual Director Defendants had a duty to do so.  To have sold Lifetouch stock in favor of an alternative investment (e.g., 3M stock or a Fidelity mutual fund), would have violated the corporate charter restricting ownership in the company.

---

[14] *See also Spires*, 271 F. Supp. 3d at 806 n.4 (same); *Vespa*, 2016 U.S. Dist. LEXIS 155048, at *5 (same).

Rather, the act of amending a company charter, even in an ESOP-owned company, is a corporate decision, not an ERISA fiduciary decision. Thus, corporate boards and corporate officers do not have an ERISA fiduciary duty to maximize shareholder value by selling sponsor stock. *See, e.g.*, *Grindstaff v. Green*, 133 F.3d 416, 425 (6th Cir. 1999) (recognizing distinction between ESOP fiduciary duties and corporate duties). Consequently, any claim that Lifetouch or the Directors Defendants should have arranged for the sale of the company's stock to Shutterfly sooner than they did is not a plausible alternative course of action.

Finally, even if it were within the discretion of any Defendant in its fiduciary capacity to divest the stock, there is no plausible allegation that there was a potential purchaser prior to 2018, when Shutterfly actually purchased the stock. To the contrary, the Complaint alleges that Defendants were working to sell Lifetouch's stock to a willing buyer "as early as August 2017." AC ¶ 68.

**Stop Using Lifetouch Contributions to Repurchase Participant Shares.** Plaintiffs also allege that the Plan should have stopped purchasing Lifetouch stock and invested new Lifetouch contributions in some other, unspecified investments (AC ¶ 80), but that theory ignores the structure of the Plan.

Although Plaintiffs vaguely suggest Lifetouch's contributions should not have been used to "purchase . . . additional Lifetouch stock" (AC ¶ 80), they acknowledge that the Plan owned all of Lifetouch during the class period. *See id.* ¶¶ 4, 55, 99(a). Thus, these contributions were used (in effect) to repurchase departing participants' shares of Lifetouch. Plan §§ 14(e); 16(a); *see supra* at 4 (describing repurchase process). In other

23

words, Plaintiffs' allegation that Lifetouch should have "prevent[ed] the purchase" of Lifetouch stock would mean that Lifetouch's contributions to pay the benefits of departing participants would no longer be used for that purpose.  Plaintiffs do not explain why Lifetouch would have authority to refuse to pay participants' their retirement benefits, which would constitute a breach of the Plan and a violation of ERISA.  Plaintiffs certainly do not allege, as they must under *Dudenhoeffer*, that no reasonable fiduciary would conclude that such an action would do more harm than good to plan participants.

     ***Terminate or Amend the Plan.***  Plaintiffs suggest that the Director Defendants or Lifetouch should have "terminate[d] the Plan" or "amend[ed] the Plan to remove Lifetouch stock as the Plan's investment vehicle."  AC ¶¶ 53, 70, 73, 80, 83.  This proposal fails for the obvious reason that termination or amendment of an ERISA plan does not implicate ERISA fiduciary duties.  *See Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 444 (1999) ("an employer's decision to amend a pension plan . . . does not implicate the employer's fiduciary duties"); *Lockheed Corp. v. Spink*, 517 U.S. 882, 891 (1996) (same).  Simply put, ERISA fiduciaries have no duty to terminate or amend a plan.

     Even if there was some duty to amend the Plan, that duty could not extend to the Trustee, who had no authority to amend or terminate the Plan.  *See* Plan § 18(a)(1) (authority to amend or terminate the Plan lies with Board of Directors).

     ***Cash Out All Plan Participants.***  Plaintiffs also suggest that Lifetouch, as a fiduciary of the Plan, should have "bought out Plan participants" in order to "liquidate their Plan holdings of Lifetouch stock."  AC ¶¶ 16, 19.  Again, this alternative is not applicable to the Trustee or Director Defendants, who had no such authority.  But in any event, this

"cash out" alternative is also implausible because Plaintiffs fail to allege that Lifetouch had a sufficient cash reserve to buy out *all* the Plan participants. *See id.* Indeed, Plaintiffs allege that Lifetouch was in a "dire" state in 2017 (*id.* ¶ 20), suggesting there was no such enormous cash reserve.

This "cash out" alternative does not satisfy *Dudenhoeffer* for another reason. As with the obligation to terminate or amend the plan, nothing in ERISA obligates a plan sponsor to repurchase an employee's investment in an ESOP because the investment is not performing well. Plan sponsors are not guarantors of a plan's investment, and Plaintiffs do not, and cannot, cite a single case or provision of ERISA requiring a plan sponsor to redeem a poorly performing investment. *See Martin*, 965 F.2d at 666 (rejecting rule that "would make ESOP fiduciaries virtual guarantors of the financial success of the plan"). Moreover, even if such an option were available, Plaintiffs fail to allege that it would not have done more harm than good, as required by *Dudenhoeffer.*

***Make Disclosures to Participants.*** Plaintiffs claim "Lifetouch should have communicated the truth regarding the inflated value of Lifetouch stock to Plan participants." AC ¶ 82. There is *no* allegation that any Defendant misrepresented anything to any participant, and Plaintiffs' "additional disclosure" alternative fails for three reasons.

First, as discussed, Plaintiff fail to allege that Lifetouch stock was "inflated." *See supra* at 10-13. Second, Plaintiffs fail to allege that Defendants were even aware or supposed to know, for example, that the stock price would continue to fall. *See Target*, 275 F.Supp.3d at 1088 (rejecting proposed alternative "disclosure" because it "rest[ed] on hindsight"). Third, Plaintiffs fail to allege that no reasonable fiduciary could have

concluded that such a disclosure would cause the Plan more harm than good.  Rather, a reasonable fiduciary might readily conclude that the disclosure would trigger a rush to redeem Lifetouch shares by vested participants, draining the company of its cash reserves, and leaving the company inoperative and more difficult to sell.  *See Armstrong*, 446 F.3d 728 (noting that privately-held ESOP fiduciary actions can cause "employees to leave before the house caved in" causing a more "acute . . . liquidity problem"); *see also Whitley v. BP, P.L.C.*, 838 F.3d 523, 529 (5th Cir. 2016) (rejecting disclosure alternative action); *Rinehart*, 817 F.3d at 68 (same).

For all of these reasons, the Court should dismiss Count I.

## III.    The Failure To Monitor Claim Fails (Count II – Director Defendants).

Plaintiffs do not plausibly allege in Count II that the Director Defendants improperly monitored the Trustees they appointed.  AC ¶ 106.  As an initial matter, Plaintiffs' failure to plausibly allege any breach by the Trustee Defendants precludes the monitoring claim. *See Target*, 275 F.Supp.3d at 1093 (collecting cases and holding that "Plaintiffs cannot maintain a claim for breach of the duty to monitor . . . absent an underlying breach").

In any event, Plaintiffs' monitoring claims fails because they do not allege, as they must, that the Director Defendants "had notice" of red flags indicating the Trustees were "incompetent" or otherwise required removal.  *In re Dynegy, Inc. ERISA Litig.*, 309 F.Supp.2d 861, 904 (S.D. Tex. 2004); *see Xcel Energy*, 312 F.Supp.2d at 1176 ("The scope of the duty to monitor appointees is relatively narrow.").  Plaintiffs do not cite a single fact suggesting that the Director Defendants had reason to believe that the Trustee valuations were improper or that the Plan's stock was an imprudent investment.  *See* AC ¶¶ 101, 106.

All Plaintiffs allege is that, in 2017, Lifetouch stock "was certain to experience further declines" (*id.* ¶ 107), an allegation that is conclusory, improperly based on hindsight, and insufficient to state a claim. *See White*, 2016 U.S. Dist. LEXIS 115875, at *59 (dismissing where "plaintiffs allege[d] no facts showing how the monitoring process was deficient").

## IV.   The Loyalty Claim Fails (Count III – Director Defendants And Lifetouch).

Plaintiffs also fail to plausibly allege "disloyal" behavior on the part of the Director Defendants or Lifetouch in Count III.  AC ¶¶ 109-116.[15]  This disloyalty claim rests on a single allegation—that some executives retired in 2015 and 2016.  *Id.* ¶ 115.  From this unsurprising fact, Plaintiffs make the inferential leap that the Director Defendants and Lifetouch "condoned the overvaluation period for the benefit of Lifetouch's retiring senior executives."  *Id.* ¶¶ 11.  This theory fails to state a claim for several reasons.

First, as discussed, there is no plausible allegation that Lifetouch stock was overvalued in 2015 or 2016.  *See supra* at 10-13.

Second, Plaintiffs acknowledge that the Trustee alone "was responsible for determining the value of Lifetouch stock" based on the "opinion of an Independent Appraiser."  AC ¶¶ 11, 54.  Plaintiffs do not allege how the Director Defendants could "cause" the Trustee or Independent Appraiser to value the company in a certain way.  *Id.*

Third, the allegation that some executives retired in 2015 and 2016 does not raise an inference that the decision to retain the stock with the product of divided loyalties.  As noted, Plaintiffs identify only *one* executive who left during this time.  *See supra* at 12-13.

---

[15] The Complaint states no loyalty claim against the Trustee Defendants.

But even if Plaintiffs had identified others, the fact that executives left a company (particularly one experiencing difficult economic circumstances) is not surprising or suggestive of malfeasance.  *See Braden*, 588 F.3d at 597 (no inference of wrongdoing from "result one would expect"); *Meiners*, 2017 U.S. Dist. LEXIS 80606, at *6 (same).[16]

Although Plaintiffs litter the Complaint with words like "loyalty" and "conflicts of interest," those are simply conclusions; without an allegation of actual, disloyal behavior, they fail to state a claim for breach of loyalty.  *See Adedipe v. U.S. Bank, Nat'l Ass'n*, 62 F.Supp.3d 879, 900 (D. Minn. 2014) (dismissing claims for breach of duties of loyalty and prudence because they were "far too conclusory"); *White*, 2016 U.S. Dist. LEXIS 115875, at *13-14 (same).  Because the Complaint contains only conclusory assertions, not facts, Count III alleging breach of the fiduciary duty of loyalty should be dismissed.

## CONCLUSION

For the foregoing reasons, the Complaint should be dismissed with prejudice

---

[16] This allegation is implausible for the further reason that the Plan required distributions to be made over at least a three-year period, meaning that retiring executives would receive a large portion of their benefits *after* the period of alleged "overvaluation."  Plan § 14(a)(1).  Thus, Plaintiffs' allegation that Defendant Harmel retired in 2016 to benefit from the allegedly "inflated" valuation is implausible.  AC ¶ 77

Dated:  June 15, 2018

DORSEY & WHITNEY LLP


By _/s/ Stephen P. Lucke_____
    Stephen P. Lucke (#0154210)
    lucke.steve@dorsey.com
    Andrew Holly (#308171)
    holly.andrew@dorsey.com
    Nicholas J. Bullard (#0397400)
    bullard.nick@dorsey.com
Suite 1500, 50 South Sixth Street
Minneapolis, MN 55402-1498
Telephone:  (612) 340-2600
Facsimile:  (612) 340-2868

*Attorneys for Defendants Michael Meek,
Paul Harmel, P. Robert Larson, Donald
Goldfus, John Anderson, Bruce Nicholson,
Bernie Alrich, Ted Koenecke, Glenn Elo,
and Lifetouch Inc.*


DRINKER BIDDLE & REATH LLP
    Theodore M. Becker (*pro hac vice*)
    theodore.becker@dbr.com
191 N. Wacker Dr., Suite 3700
Chicago, IL 60606-1698
Telephone:  (312) 569-1698
Facsimile:  (312) 569-3000

*Attorney for Defendants Ted Koenecke
and Glenn Elo*

WINSTON & STRAWN LLP
    Cardelle B. Spangler (*pro hac vice*)
    cspangler@winston.com
    Heather L. Kriz (*pro hac vice*)
    hkriz@winston.com
35 West Wacker Drive
Chicago, IL  60601-9703
Telephone: (312) 558-5600
Facsimile: (312) 588-5700

*Attorneys for Defendant Lifetouch Inc.*