# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MINNESOTA

|  |  |
|---|---|
| DEBORAH VIGEANT, RHONDA WOOD, ELIZABETH MILLANE, DOUGLAS ECKELBECKER, AMANDA ECKELBECKER, RODNEY UTING, and LAWRENCE ANDERSON, and all other individuals similarly situated,<br><br>    Plaintiffs,<br><br>vs.<br><br>MICHAEL MEEK, PAUL HARMEL, P. ROBERT LARSON, DONALD GOLDFUS, JOHN ANDERSON, BRUCE NICHOLSON, BERNIE ALRICH, TED KOENECKE, GLENN ELO, NEWPORT TRUST COMPANY, and LIFETOUCH INC.,<br><br>    Defendants. | Case No.: 0:18-cv-00577-JNE-TNL |

## PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE AMENDED CLASS ACTION COMPLAINT

**Douglas J. Nill, PLLC**
**d/b/a FarmLaw**

2050 Canadian Pacific Plaza
120 South Sixth Street
Minneapolis, MN 55402-1801
Telephone: (612) 573-3669
Facsimile: (612) 330-0959
*dnill@farmlaw.com*

*Counsel for Plaintiffs and*
*the Putative Class*

**ZAMANSKY LLC**

Jacob H. Zamansky (admitted *pro hac vice*)
Samuel E. Bonderoff (admitted *pro hac vice*)
Edward H. Glenn, Jr. (admitted *pro hac vice*)
Justin Sauerwald (admitted *pro hac vice*)
50 Broadway, 32nd Floor
New York, NY 10004
Telephone: (212) 742-1414
Facsimile: (212) 742-1177
*jake@zamansky.com*

*Additional Counsel for Plaintiffs*
*and the Putative Class*

## Table of Contents

**Page**

INTRODUCTION ................................................................................................ 1

ARGUMENT ..................................................................................................... 5

I.   Plaintiffs Have Adequately Alleged a Breach of the Fiduciary Duty of
     Prudence as to the 2015 and 2016 Valuations ................................................... 6

     a.   The 2015 and 2016 Valuations Were Artificially Inflated ............................... 7

     b.   Defendants' Failure to Act on the Artificial Inflation of
          Lifetouch Stock Was a Breach of Fiduciary Duty .......................................... 9

II.  Plaintiffs Have Adequately Pleaded a Breach of the Fiduciary Duty of
     Prudence as to the 2017 and 2018 Valuations ................................................. 18

     a.   Newport Trust's Purported Factual Assertions Regarding the
          Shutterfly Purchase Price Should Not Be Credited on a Motion to Dismiss ......... 19

     b.   Newport Trust Breached Its Fiduciary Duty of Prudence in
          Approving the $825 Million Purchase Price .................................................. 22

III. Plaintiffs Have Adequately Pleaded Breach of the Duty of Loyalty ....................... 23

IV.  Plaintiffs Have Adequately Pleaded a Breach of the Duty to Monitor ..................... 23

V.   If the Court Grants Defendants' Motions to Dismiss,
     It Should Do So Without Prejudice ............................................................... 24

CONCLUSION ................................................................................................. 26

## Table of Authorities

**Page(s)**

### Cases

*Allen v. GreatBanc Trust Co.*,
   835 F.3d 670 (7th Cir. 2016) ................................................................ 14, 22

*Armstrong v. LaSalle Bank Nat'l Ass'n*,
   446 F.3d 728 (7th Cir. 2006) ...................................................................... 10

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) .......................................................................................... 6

*Aten v. Scottsdale Ins. Co.*,
   511 F.3d 818 (8th Cir. 2009) ........................................................................ 6

*Beaulieu v. Ludeman*,
   2008 U.S. Dist. LEXIS 119324 (D. Minn. Feb. 7, 2008) ............................. 22

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) .......................................................................................... 6

*Bigger v. Am. Commercial Lines*,
   862 F.2d 1341 (8th Cir. 1988) .................................................................... 23

*Braden v. Wal-Mart Stores, Inc.*,
   588 F.3d 585 (8th Cir. 2009) ............................................................ 6, 17, 22

*Brannen v. First Citizens Bankshares, Inc.*,
   2016 U.S. Dist. LEXIS 114775 (S.D. Ga. Aug. 26, 2016) ........................... 10

*Cent. States, Southeast & Southwest Areas Pension Fund v. Cent. Transp., Inc.*,
   472 U.S. 559 (1985) ......................................................................................... 17

*Clayton v. White Hall Sch. Dist.*,
   778 F.2d 457 (8th Cir. 1985) ...................................................................... 26

*Crocker v. KV Pharm. Co.*,
   782 F. Supp. 2d 760 (E.D. Mo. 2010) ........................................................ 24

ii

*Donovan v. Bierwirth*,
   680 F.2d 263 (2d Cir. 1982) ......................................................................................... 1

*Dunnigan v. Fed. Home Loan Mortg. Corp.*,
   184 F. Supp. 3d 726 (D. Minn. 2016).........................................................................21

*Erickson v. Pardus*,
   551 U.S. 89 (2007).......................................................................................................17

*Fifth Third Bancorp v. Dudenhoeffer*,
   134 S. Ct. 2459 (2014).................................................................................. 14, 15, 17

*Fish v. Greatbanc Tr. Co.*,
   2016 U.S. Dist. LEXIS 137351 (N.D. Ill. Sept. 1, 2016) .............................................12

*Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*,
   270 F.3d 645 (8th Cir. 2001) .....................................................................................19

*In re 2007 Novastar Fin. Inc., Sec. Litig.*,
   579 F.3d 878 (8th Cir. 2009) .....................................................................................26

*In re ADC Telcoms., Inc.*,
   2004 U.S. Dist. LEXIS 14383 (D. Minn. July 26, 2004) .............................................11

*In re Elec. Data Sys. Corp. "ERISA" Litig.*,
   305 F. Supp. 2d 658 (E.D. Tex. 2004)........................................................................13

*In re Marsh ERISA Litig.*,
   2006 U.S. Dist. LEXIS 90631 (S.D.N.Y. Dec. 14, 2006) ............................................13

*In re Polaroid ERISA Litig.*,
   362 F. Supp. 2d 461 (S.D.N.Y. 2005) ........................................................................13

*In re Target Corp. Sec. Litig.*,
   275 F. Supp. 3d 1063 (D. Minn. 2017).................................................................12, 15

*In re Worldcom, Inc.*,
   263 F. Supp. 2d 745 (S.D.N.Y. 2003) ........................................................................13

*In re Xcel Energy, Inc.*,
   312 F. Supp. 2d 1165 (D. Minn. 2004).................................................................14, 23

*Jander v. IBM*,
    205 F. Supp. 3d 538 (S.D.N.Y. 2016) ........................................................................ 13

*Kushner v. Beverly Enters.*,
    317 F.3d 820 (8th Cir. 2003) ...................................................................................... 19

*Little Gem Life Scis., LLC v. Orphan Med., Inc.*,
    537 F.3d 913 (8th Cir. 2008) ...................................................................................... 19

*Martin v. Feilen*,
    965 F.2d 660 (8th Cir. 1992) ...................................................................................... 23

*Mattes v. ABC Plastics, Inc.*,
    323 F.3d 695 (8th Cir. 2003) ........................................................................................ 6

*Morrison v. Moneygram Int'l, Inc.*,
    607 F. Supp. 2d 1033 (D. Minn. 2009) ...................................................................... 11

*Precision Vascular Sys., Inc. v. Sarcos, L.C.*,
    199 F. Supp. 2d 1181 (D. Utah 2002) ........................................................................ 13

*Sheldon v. Vermonty*,
    31 F. Supp.2d 1287 (D. Kan. 1998) ............................................................................ 14

*Tibble v. Edison Int'l*,
    135 S. Ct. 1823 (2015) ................................................................................................ 11

*Varity Corp. v. Howe*,
    516 U.S. 489 (1996) .................................................................................................... 13

*Vila v. Inter-Am. Inv. Corp.*,
    570 F.3d 274 (D.C. Cir. 2009) .................................................................................... 17

*Wieland v. U.S. Dep't of Health and Human Servs.*,
    793 F.3d 949 (8th Cir. 2015) ...................................................................................... 21

*Wright v. Medtronic*,
    2010 U.S. Dist. LEXIS 24748 (D. Minn. Mar. 17, 2010) ............................................ 5

Plaintiffs Deborah Vigeant, Rhonda Wood, Elizabeth Millane, Douglas Eckelbecker, Amanda Eckelbecker, Rodney Uting, and Lawrence Anderson (collectively, "Plaintiffs"), by and through their attorneys, file this Omnibus Opposition to Defendants' Motions to Dismiss the Amended Class Action Complaint on behalf of themselves and other similarly situated current and former employees of Lifetouch Inc. ("Lifetouch" or the "Company").

## INTRODUCTION

Plaintiffs, representing a putative class of current and former employees of Lifetouch, bring claims under the Employee Retirement Income Security Act of 1974 ("ERISA") for breaches of the fiduciary duties of prudence and loyalty based on the utter failure of Defendants, fiduciaries of the Lifetouch Inc. Employee Stock Ownership Plan (the "Plan"), to adhere to duties that are supposed to be the "highest known to the law." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982). Because of Defendants' misconduct, at least $800 million, and perhaps more than $1 billion, of Lifetouch employees' retirement savings has been lost. (AC ¶¶ 6, 62, 72, 81.)[1]

Lifetouch is a professional photography company that, until it was recently acquired by Shutterfly, Inc. ("Shutterfly"), was privately held and owned entirely by its employees. (AC ¶¶ 4-6.) The Plan was the vehicle through which this employee ownership was accomplished.

---

[1] "AC" refers to Plaintiffs' Amended Class Action Complaint. (*See* Dkt. No. 30.)

1

Three groups comprise Defendants:

1. The members of the Lifetouch Board of Directors, who were named fiduciaries of the Plan and were responsible for overseeing and monitoring the fiduciaries tasked with managing the Plan.  (AC ¶ 46.)

2. Lifetouch itself, also a named fiduciary of the Plan and the official Plan Administrator responsible for, among other things, communicating with Plan participants.  (AC ¶¶ 51-52.)

3. The Trustee, directly responsible for managing the Plan and for the valuation of Lifetouch stock, the principal asset of the Plan.  (AC ¶¶ 47-50.)  Until May 2017, two senior executives at Lifetouch served as the Trustee.  (*Id.* ¶ 48.)  After that time, Evercore Trust Company, N.A. ("Evercore") assumed the role of Trustee. (*Id.* ¶ 49.)  Defendant Newport Trust Company ("Newport Trust") acquired Evercore in October 2017 and assumed all of Evercore's liabilities.  (*Id.* ¶ 43.)

Each of these Defendants owed fiduciary duties under ERISA to Plaintiffs and the other Plan participants.  Each of these Defendants also breached those fiduciary duties in multiple ways.

In 2015 and 2016, Lifetouch, facing a new digital landscape in the photography business, suffered repeated financial setbacks—studio closings, facility closings, layoffs, and the departure of numerous senior executives.  (AC ¶¶ 58-59, 75-77.)  Strangely, however, Lifetouch's stock valuations remained buoyant at $93 a share in 2015 and $88 a share in 2016.  (*Id.* ¶ 58.)  Only in 2017, after the retirements of senior executives, including

Defendant Paul Harmel, were completed did the valuation of Lifetouch's stock approach reality, dropping a stunning *36%* to $56 a share.  (*Id.* ¶¶ 64, 77-78.)  Yet the bad news had all hit Lifetouch in 2015 and 2016, so the tepid drops in valuation during those years made little sense, especially when compared with the massive 2017 drop that followed.  (*Id.* ¶¶ 58-62, 75-78.)

The 2015 and 2016 valuations constituted breaches of Defendants' fiduciary duties. The Lifetouch executives responsible for valuing Lifetouch's stock should have recognized that their pricing did not match Lifetouch's beleaguered financial reality and should have investigated the evident discrepancy.  (AC ¶¶ 58-59, 99.)  More egregiously, the Board members and Lifetouch itself deliberately manipulated the data provided to the Trustee to inflate Lifetouch's value so that members of their cohort, including Defendant Harmel, could cash out their Lifetouch shares at an artificially high price.  (*Id.* ¶¶ 61-62.)

These actions had terrible consequences for Plaintiffs and other Plan participants. Because Lifetouch stock was artificially overvalued, the Plan purchased fewer shares than it could otherwise afford if the stock had been correctly valued.  (AC ¶ 78.)  Moreover, employees who cashed out at these artificially inflated prices did so to the detriment of those who remained in the Plan.  (*Id.* ¶¶ 81, 84.)  As much as $1 billion in value to Plan participants was likely lost in this way.  (*Id.*)

In 2017, with Defendant Harmel safely retired, Newport Trust, not having to rely on manipulated data, appeared to value Lifetouch stock accurately.  (AC ¶¶ 62-64.)  Yet by that time Lifetouch was already planning to sell itself, and Shutterfly soon proved to be a

willing buyer.  (*Id.* ¶¶ 67-68.)  When Shutterfly's acquisition was announced in January 2018, however, despite the financial condition of Lifetouch being virtually unchanged from the time of the 2017 valuation, the acquisition price was only $825 million (plus unspecified, and potentially valueless, "cash and cash equivalents"), a more-than-17% drop in value.  (*Id.* ¶¶ 70-71.)  Although Newport Trust should have recognized that this price was too low and not an accurate reflection of the Company's value, it did not investigate the issue, and Lifetouch employees were harmed again.  (*Id.* ¶¶ 71-72, 99.)

In the face of these disturbing allegations of misconduct, Defendants have filed two motions to dismiss.[2]  None of the arguments advanced in either motion should persuade this Court to dismiss any of Plaintiffs' claims.

The Lifetouch Defendants' main contention is that Plaintiffs' allegations are not specific enough.  Yet longstanding precedent in this Circuit holds that in ERISA cases such as this, where the plaintiff is an employee without access to high-level inside information, specificity in pleading is hard to come by; a plaintiff can allege circumstantial evidence of wrongdoing and a Court can reasonably infer from those allegations that a breach of fiduciary duty occurred.  What is more, however, is that where Plaintiffs have made extremely detailed and specific allegations regarding the means by which Defendants manipulated the valuation of Lifetouch stock, the Lifetouch Defendants all but ignore them,

---

[2]      The memorandum of law in support of the motion of Defendants Michael Meek, Paul Harmel, P. Robert Larson, Donald Goldfus, John Anderson, Bruce Nicholson, Bernie Alrich, Ted Koenecke, Glenn Elo, and Lifetouch Inc. (collectively, the "Lifetouch Defendants") (*see* Dkt. No. 67) is abbreviated throughout as "LD Mem."  The memorandum of law in support of the motion of Defendant Newport Trust (*see* Dkt. No. 52) is abbreviated throughout as "NT Mem."

arguing only in passing that such allegations should be subject to the particularized, fraud-based pleading standard of Federal Rule 9(b), which has never been held to apply to pure breach-of-fiduciary-duty allegations like Plaintiffs'.

Newport Trust bases almost the entirety of its dismissal arguments on a bald assertion of purported fact:  namely, that Lifetouch was not really acquired for $825 million, but actually for $963 million—or $988 million, or perhaps some other figure. Newport Trust supports its claim with a declaration from one of its employees and a Securities and Exchange Commission ("SEC") filing by Shutterfly.  Neither of these pieces of putative evidence has been tested through discovery; indeed, Newport Trust can offer no authority that would permit this Court to take judicial notice of these documents for the truth of their contents.  Which is just as it should be at the motion-to-dismiss stage, when only the allegations in Plaintiffs' pleading are supposed to be taken as true.

Defendants' misconduct has depleted Lifetouch employees of hundreds of millions, if not billions, of dollars of their retirement savings.  Defendants should be held accountable.  Accordingly, and for the reasons discussed below, Defendants' motions to dismiss should be denied.

## ARGUMENT

In reviewing a motion to dismiss, a court must accept as true all factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor.  *Wright v. Medtronic*, 2010 U.S. Dist. LEXIS 24748, at *8 (D. Minn. Mar. 17, 2010); *Aten v.*

*Scottsdale Ins. Co.*, 511 F.3d 818, 820 (8th Cir. 2009); *Maki v. Allete, Inc.*, 383 F.3d 740, 742 (8th Cir. 2004); *Mattes v. ABC Plastics, Inc.*, 323 F.3d 695, 697 (8th Cir. 2003).

Federal Rule of Civil Procedure 12(b)(6)'s plausibility standard is not "a probability requirement." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation and internal quotation marks omitted). A "well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of the facts alleged is improbable, and that a recovery is very remote and unlikely." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007) (quotations omitted).

In an ERISA action, the Court "must take account of [plaintiffs'] limited access to crucial information." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009). "If plaintiffs cannot state a claim without pleading facts which tend systemically to be in the sole possession of defendants, the remedial scheme of the statute will fail, and the crucial rights secured by ERISA will suffer." *Id.*

## I.   Plaintiffs Have Adequately Alleged a Breach of the Fiduciary Duty of Prudence as to the 2015 and 2016 Valuations

Lifetouch stock was valued at an artificially inflated price in 2015 and 2016. (AC ¶¶ 11, 16, 20, 58-62, 78.) The Board Defendants[3] and Lifetouch enabled this artificially inflated valuation by providing manipulated, inaccurate data to the Lifetouch Trustees[4] and thereby to the independent advisor tasked with performing the actual valuation. (*Id.* ¶¶ 11,

---

[3]   Defendants Michael Meek, Paul Harmel, P. Robert Larson, Donald Goldfus, John Anderson, Bruce Nicholson and Bernie Alrich were members of Lifetouch's Board of Directors during the Class Period (June 30, 2015 through the present) and were thus fiduciaries of the Plan. (AC ¶¶ 1, 34-40, 46.)

[4]   Defendants Ted Koenecke and Glenn Elo were senior executives at Lifetouch and served as Trustees of the Plan until May 2017. (AC ¶¶ 41-42, 47-48.)

61, 78, 82.)  The Lifetouch Trustees should have recognized the warning signs that the valuations they signed off on were based on inaccurate data in light of Lifetouch's precarious economic circumstances in 2015 and 2016, and they should have investigated the potential artificial inflation of Lifetouch's stock instead of doing nothing.  (*Id.* ¶¶ 5, 12-14, 58-59, 99.)  The Board Defendants and Lifetouch should never have manipulated the valuation of Lifetouch's stock in the first place.  (*Id.* ¶¶ 11, 16-17, 20, 61-62, 77-78.)  Failing that, the Board Defendants, as fiduciaries responsible for monitoring the Lifetouch Trustees, should have intervened when the Lifetouch Trustees endorsed artificially inflated valuations of Lifetouch stock in 2015 and 2016 (even though the Board Defendants were responsible for the manipulated inputs that engendered those artificially inflated valuations).  (*Id.* ¶¶ 79-81, 106-07.)  Lifetouch, as the Plan Administrator, was responsible for communicating with Plan participants; it should have communicated the truth of Lifetouch stock's value once the Lifetouch Trustees endorsed an artificially inflated valuation of that stock.  (*Id.* ¶¶ 51-52, 82-84.)  By enabling the artificially inflation of Lifetouch stock and taking no action to protect Plan participants from being invested in artificially inflated stock, all of these Defendants breached their fiduciary duties of prudence.  (*Id.* ¶¶ 11-20, 58-63, 74-84.)

     a.  The 2015 and 2016 Valuations Were Artificially Inflated

Even at the pleading stage, without the benefit of any discovery, there is ample evidence that the 2015 and 2016 valuations of Lifetouch stock—at $93 and $88 per share,

respectively—did not reflect its true value and were, in fact, artificially inflated by the Board Defendants and Lifetouch itself.  (AC ¶¶ 14, 58.)

**First**, the Board Defendants and Lifetouch manipulated the data used to determine the value of Lifetouch's stock.  A key metric provided to the independent advisor in valuing Lifetouch stock was the number of "sits"—sittings for photographs—that the Company had during the prior year.  (AC ¶ 61.)  Lifetouch inflated this figure in at least two ways.  As alleged in the Complaint, "if Lifetouch booked a family of five for a photoshoot, instead of marking that shoot as one 'sit,' Lifetouch would count it as six—one for the family, and then one for each individual member of the family."  (*Id.*)  In such a situation Lifetouch only profited from one "sit," yet Lifetouch booked it as six, making its financial benefit appear to be six times greater than it actually was.  (*Id.*)

As further alleged in the Complaint, "Lifetouch would send large teams of employees to do photoshoots in faraway places even though only one or two appointments had been booked, and the profit from the shoot could not justify the expense of the travel.  Such expensive shoots counted as sits, however, and thus further boosted Lifetouch's ostensible value" even though those travel-heavy sits were not actually profitable for the Company.  (AC ¶ 61.)  In these ways, the financial data provided to the independent advisor tasked with performing the valuation of Lifetouch's stock was fundamentally tainted and gave rise to an artificially inflated outcome.  (*Id.* ¶¶ 11, 61, 78, 82.)

**Second**, Lifetouch experienced significant deterioration in its financial condition throughout 2015 and especially 2016, yet its stock-price valuations during this time barely

reflected the Company's struggles.  During this time, Lifetouch experienced a wave of closures of its portrait studios in J.C. Penney and Target stores.  (AC ¶¶ 12-13, 59, 75-77.) In November 2015, Lifetouch was forced to close its Charlotte, North Carolina production facility and lay off 206 employees, even though it had acquired those facility only four years earlier.  (*Id.*)  Lifetouch also suffered the resignations of numerous senior experiences, culminating in the departure of then-Chief Executive Officer ("CEO") Paul Harmel in July 2016.  (*Id.*)

**Third**, and perhaps most damning, once all of Lifetouch's senior executives, particularly Defendant Harmel, had retired, Lifetouch's 2017 valuation reflected a steep drop in the value of the Company—roughly 36%—even though there had been no material change in the Company's fortunes during the intervening period.  (AC ¶¶ 14, 17, 58, 64, 80.)  All of the significant financial distress had occurred in 2015 and 2016.  (*Id.* ¶¶ 58-59, 75-77.)  Even Harmel's retirement, while technically occurring in July 2016, just days after the 2016 valuation on June 30, 2016, was known to the Lifetouch Trustees when the 2016 valuation was performed and thus should only have impacted the 2016 valuation, not the 2017 one.  (*Id.* ¶ 58.)

b. Defendants' Failure to Act on the Artificial Inflation of Lifetouch Stock Was a Breach of Fiduciary Duty

By causing Lifetouch stock to be valued at an artificially inflated price, the Board Defendants and Lifetouch breached their fiduciary duties.  The Lifetouch Trustees may or may not have known that the data being provided to the independent advisor had been manipulated; but, at a minimum, the Lifetouch Trustees had enough warning signs about

9

the financial distress that Lifetouch was experiencing that they should have investigated whether Lifetouch stock remained a prudent investment or whether it had become imprudent by virtue of being artificially inflated. *See Armstrong v. LaSalle Bank Nat'l Ass'n*, 446 F.3d 728, 734 (7th Cir. 2006) ("A trustee who simply ignored changed circumstances that have increased the risk of loss to the trust's beneficiaries is imprudent"); *see also Brannen v. First Citizens Bankshares, Inc.*, 2016 U.S. Dist. LEXIS 114775, at *17-19 (S.D. Ga. Aug. 26, 2016) (allegations that an employee stock plan fiduciary failed to investigate continued prudence of holding employer's stock sufficient to state a claim for breach of the fiduciary duty of prudence).

The Lifetouch Defendants collectively offer a series of arguments why an adequate claim nevertheless has not been pleaded; none is persuasive.

The Lifetouch Defendants first argue that "Plaintiffs do not directly criticize the [Lifetouch Trustees'] valuation process[,]" and, therefore, no duty-of-prudence against the Lifetouch Trustees can lie. (LD Mem. 10.) Defendants are mistaken; Plaintiffs allege that the valuation process was tainted by the input of manipulated data, which the Lifetouch Trustees would have discerned had they investigated the dramatic gulf between the generous valuations of 2015 and 2016 and Lifetouch's dismal financial reality over that same period. (AC ¶¶ 12-14, 58-59, 64, 75-77, 80, 99.) The Lifetouch Defendants argue that faulting the Lifetouch Trustees for their failure to take note of Lifetouch's financial hardship is "hindsight" (LD Mem. 11), but it is no such thing. Lifetouch's Charlotte facility's closure happened in November 2015; over 200 employees were laid off at that

10

time; Lifetouch experienced studio closures all over the country throughout 2015 and 2016; the retirement of Harmel and other senior executives was known prior to the June 30, 2016 valuation.  Between the 2016 and 2017 valuations, nothing materially changed regarding the Company's financial situation, yet the value of the Company's stock dropped *36%*, conveniently *after* Defendant Harmel had managed to cash out of his stock holdings.[5]

In other words, these warning signs, demonstrating that Lifetouch was in serious financial trouble, were known—and knowable—*at the time*, not with the benefit of hindsight.  The failure of the Lifetouch Trustees even to investigate the marked contrast between Lifetouch's financial circumstances and the sunny inputs going into the stock valuations was a dereliction of the basic duty of an ERISA fiduciary to monitor the continued prudence of employee retirement investments.  *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1829 (2015) (a fiduciary has "a continuing duty of some kind to monitor investments" and "a plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments").  The Lifetouch Trustees' complete inaction in the face of contemporaneous warning signs is more than enough to adequately allege their breach of the fiduciary duty of prudence.  *See Morrison v. Moneygram Int'l, Inc.*, 607 F. Supp. 2d 1033, 1053-54 (D. Minn. 2009); *In re ADC Telcoms., Inc.*, 2004 U.S. Dist. LEXIS 14383, at *20-22 (D. Minn. July 26, 2004).

---

[5]   The Lifetouch Defendants claim that "Plaintiffs fail to explain why the 2017 valuation process—with the same Independent Appraiser—delivered a correct 2017 value, but incorrect 2015 and 2016 values." (LD Mem. 12.)  Actually, Plaintiffs offer an obvious explanation for the difference; once Defendant Harmel had retired, the Board Defendants and Lifetouch stopped manipulating the underlying valuation data.  (AC ¶¶ 14, 61, 78, 115.)

The Lifetouch Defendants next seek to exonerate the Board Defendants and Lifetouch on the ground that neither "could be primarily liable for improper valuation of, or failure to monitor, Lifetouch stock." (LD Mem. 16.) Yet these Defendants *are* alleged to have manipulated the data that was used to value Lifetouch stock, thus giving them direct responsibility for the failure of the valuation process to accurately value Lifetouch stock. (AC ¶¶ 11, 17, 61, 78.)

Citing this Court's decision in *In re Target Corp. Sec. Litig.*, 275 F. Supp. 3d 1063 (D. Minn. 2017), the Lifetouch Defendants justify the Board Defendants' and Lifetouch's provision of manipulated data to the Lifetouch Trustees by arguing that "'ERISA does not impose a duty on ESOP fiduciaries to keep their appointees apprised of nonpublic information' about the company, even if it might inform the ESOP trustee's decisions." (LD Mem. 17 (quoting *Target*, 275 F. Supp. 3d at 1093).) As the Lifetouch Defendants acknowledge, however, the issue here is not about disclosing "nonpublic" information about a public company, where such disclosure could trigger liabilities and obligations under, and might otherwise contravene, the federal securities laws. (*Id.*) Lifetouch was a privately-held company.[6]  More important, the Board Defendants and Lifetouch are not alleged to have withheld information from the Lifetouch Trustees and, therefore, from the

---

[6]     *Fish v. Greatbanc Tr. Co.*, 2016 U.S. Dist. LEXIS 137351 (N.D. Ill. Sept. 1, 2016), relied on by Lifetouch Defendants for the proposition that an ERISA fiduciary of a privately-held company may also withhold "nonpublic" information from another fiduciary, actually says that "the Court need not decide today whether ERISA imposes a duty to inform" as between fiduciaries of privately-held companies. *Id.* at *170. That decision was also reached after not only discovery, but a full trial on the merits. *Id.* And it certainly has nothing to say about whether one fiduciary may mislead another fiduciary without breaching his or her duty. *Id.*

12

independent advisor; they are alleged to have manipulated the information provided to the Lifetouch Trustees and the independent advisor, rendering that information inaccurate and artificially inflating the valuation of Lifetouch stock.   Neither this Court's decision in *Target* nor any other ERISA jurisprudence legitimizes the provision of false information by a fiduciary.   After all, "lying is inconsistent" with the fiduciary duty under ERISA. *Varity Corp. v. Howe*, 516 U.S. 489, 506 (1996).

The Lifetouch Defendants glancingly suggest in a footnote that Plaintiffs' allegations of data manipulation by the Board Defendants and Lifetouch "must be pled with the particularity required by Fed. R. Civ. 9(b)."  (LD Mem. 17 n.11.)  But the majority of courts have found that claims for breach of fiduciary duty under ERISA need only be pleaded consistent with Federal Rule of Civil Procedure 8.   *See Jander v. IBM*, 205 F. Supp. 3d 538, 542 (S.D.N.Y. 2016) ("'[A]llegations similar to fraud do not implicate Rule 9(b) where the gravamen of the claim is grounded in ERISA.'") (quoting *In re Polaroid ERISA Litig.*, 362 F. Supp. 2d 461, 470 (S.D.N.Y. 2005)); *In re Elec. Data Sys. Corp. "ERISA" Litig.*, 305 F. Supp. 2d 658, 672 (E.D. Tex. 2004) ("Although fraud and breach of a duty to inform may both involve an omission, the Court does not find that every breach of a fiduciary duty to inform is a scheme to defraud.  Thus, Rule 9(b) does not apply to these pleadings …").[7]  Even the one authority cited by the Lifetouch Defendants, *In re Xcel*

---

[7]      *See also In re Marsh ERISA Litig.*, 2006 U.S. Dist. LEXIS 90631, at *8-9 (S.D.N.Y. Dec. 14, 2006) (noting that "fiduciary duty claims brought under ERISA are subject only to the 'simplified pleading standard' of Federal Rule of Civil Procedure 8(a) rather than the heightened pleading standard of Federal Rule of Civil Procedure 9(b)") (quoting *In re Worldcom, Inc.*, 263 F. Supp. 2d 745, 756 (S.D.N.Y. 2003)) (additional citations omitted); *Precision Vascular Sys., Inc. v. Sarcos, L.C.*, 199 F. Supp. 2d 1181, 1191 (D. Utah 2002) ("Generally, 'a plaintiff pleading a claim for breach of fiduciary duty need only comply

*Energy, Inc.*, 312 F. Supp. 2d 1165 (D. Minn. 2004), held that, where "plaintiffs' breach of fiduciary duty claims are premised on defendants' failure to act in light of the adverse circumstances that were hidden by the fraudulent conduct . … Rule 9(b) does not apply in these circumstances." *Id.* at 1179.

The Lifetouch Defendants also try to excuse their misconduct by arguing that the Supreme Court's decision in *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459 (2014), thwarts any attempt by Plaintiffs to hold them responsible for artificially inflating the value of Lifetouch stock and doing nothing to investigate that inflation despite clear red flags that the valuations did not match up with Lifetouch's financial reality. (LD Mem. 18-26.) As an initial matter, however, *Dudenhoeffer* should not apply to fiduciary actions (or inaction) at privately-held companies. As the Seventh Circuit observed in *Allen v. GreatBanc Trust Co.*, 835 F.3d 670 (7th Cir. 2016), "*Dudenhoeffer*'s rationale—the need to protect fiduciaries from running up against insider trading law by relying on non-public information for stock valuation—has no application to the private stock context." *Id.* at 679. Where, as here, the stock valuation in question was not based on "a trustworthy benchmark[,]" a breach of the fiduciary duty of prudence is adequately pleaded. *Id.*

It makes sense why *Dudenhoeffer*, with its formulation that a duty-of-prudence claim must adequately allege an action that a fiduciary could have taken that he or she could reasonably have believed would not do "more harm than good" to the Plan and its participants, would be inapposite in the private-company context. *Dudenhoeffer*, 134 S.

_____

with Rule 8 . . . , not Rule 9(b), because this claim is not based on fraud.'") (quoting *Sheldon v. Vermonty*, 31 F. Supp.2d 1287, 1295 (D. Kan. 1998)).

Ct. at 2473.  The Supreme Court in *Dudenhoeffer* was particularly concerned that a proposed action by a fiduciary, especially one with knowledge of an artificially inflated stock price, might "do more harm than good to the fund by causing a drop in the stock price and a concomitant drop in the value of the stock already held by the fund."  *Id.*  Courts analyzing duty-of-prudence claims involving publicly-traded stocks have analyzed the sufficiency of claims under this rubric.  *See, e.g.*, *Target*, 275 F. Supp. 3d at 1085-88.

No such concern arises with a privately-held company like Lifetouch, thus obviating the need for applying *Dudenhoeffer* altogether.  But whether *Dudenhoeffer* is in the mix or not, it is hard to see how the proposed actions that Plaintiffs allege the Lifetouch Defendants should have taken with respect to the 2015 and 2016 valuations would have been more harmful than helpful.  Plaintiffs propose, first and foremost, that the Board Defendants and Lifetouch should *not* have manipulated the data that was used to generate the 2015 and 2016 valuations.  (AC ¶¶ 61-62.)  Similarly, the Lifetouch Trustees should have recognized that the 2015 and 2016 valuations could not be squared with Lifetouch's dire financial circumstances, and they should have investigated the accuracy of those valuations.  (*Id.* ¶¶ 58-62, 75-77, 99.)  What harm would have come to Plan participants if Lifetouch stock had been accurately valued in 2015 and 2016?  The Lifetouch Defendants do not—and, indeed, cannot—say.

Alternatively, Lifetouch, as Plan Administrator, could have honestly communicated to Plan participants the true value of Lifetouch stock notwithstanding the artificially inflated valuations.  (AC ¶¶ 82-84.)  The Lifetouch Defendants suggest that "a reasonable

fiduciary might readily conclude that the disclosure would trigger a rush to redeem Lifetouch shares by vested participants, draining the company of its cash reserves, and leaving the company inoperative and difficult to sell." (LD Mem. 26.) In the context of public securities markets, disclosure of adverse information may "trigger a rush," but the Lifetouch Defendants offer no compelling reason why such a disaster would occur with a privately-held, employee-owned company. Nor is it reasonable for Plaintiffs to have to rebut this nightmare fantasy at the pleading stage without the benefit of discovery. And perhaps most important, if the Lifetouch Defendants truly believe that disclosure of Lifetouch's actual financial condition to the Company's employees in 2015 or 2016 would "trigger a rush" that would precipitate its destruction, what does that say about whether Lifetouch stock was a prudent retirement investment for those employees at that time?

Plaintiffs also propose that the Lifetouch Trustees "could have mandated the redemption of Plan participants' stock holdings until such time as Lifetouch reversed its precipitous decline and its stock once again became a prudent investment." (AC ¶ 62.) The Lifetouch Defendants contend that such an action would constitute an improper "diversification requirement" from which they are exempted under *Dudenhoeffer*. (LD Mem. 18.) Even *Dudenhoeffer*, however, does not allow fiduciaries to maintain company stock holdings no matter how imprudent they become. Even where, as here, the Plan's governing trust document mandated that employees' investments be kept primarily in Lifetouch stock, when that investment became imprudent, the Lifetouch Trustees were free to deviate from that prescription, because "'trust documents cannot excuse trustees from

16

their duties under ERISA.'" *Dudenhoeffer*, 134 S. Ct. at 2469 (quoting *Cent. States, Southeast & Southwest Areas Pension Fund v. Cent. Transp., Inc.*, 472 U.S. 559, 568 (1985)).

Ultimately, the Lifetouch Defendants purport to find fault with Plaintiffs' allegations regarding the 2015 and 2016 valuations for an insufficient specificity about the particulars of the valuation process or the Board Defendants' and Lifetouch's manipulation of the underlying data. Such arguments seek to impose an unfair burden on Plaintiffs, who are not sophisticated parties and have not had the benefit of discovery. As the Eighth Circuit held in *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585 (8th Cir. 2009), an employee alleging a breach of the fiduciary duty of prudence need not "plead 'specific facts' explaining precisely how the defendant's conduct was unlawful." *Id.* at 595 (quoting *Erickson v. Pardus*, 551 U.S. 89, 93 (2007)). Even where Plaintiffs do not "directly address[ ] the process by which the Plan was managed[,]" so long as Plaintiff's allegations, "[t]aken as true, and considered as a whole," allow this Court to reasonably infer Defendants' misconduct, then Plaintiffs' claim has been adequately alleged.[8] *Id.* at 596. After all, "[n]o matter how clever or diligent, ERISA plaintiffs generally lack the inside information necessary to make out their claims in detail unless and until discovery commences." *Id.* at 598. Plaintiffs have more than satisfied this burden regarding the 2015 and 2016 valuations.

---

[8]     "[T]he complaint should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible." *Braden*, 588 F.3d at 594 (citing *Vila v. Inter-Am. Inv. Corp.*, 570 F.3d 274, 285 (D.C. Cir. 2009) (other citations omitted)).

## II.    Plaintiffs Have Adequately Pleaded a Breach of the Fiduciary Duty of Prudence as to the 2017 and 2018 Valuations

In June 2017, soon after Newport Trust took over as Trustee of the Plan, Lifetouch stock was valued at $56, a 36% decline from the prior year, despite no material changes to the Company having occurred during the intervening year.  (AC ¶¶ 17, 64.)  Lifetouch evidently decided to sell itself around that time, and discussions with Shutterfly regarding a possible acquisition may have commenced as early as August 2017.  (*Id.* ¶¶ 67-68.)  The Shutterfly acquisition of Lifetouch was announced on January 30, 2018, but at a purchase price of only $825 million.  (*Id.* ¶ 70.)  This represented a significant decline from the Company's June 2017 valuation at $56 a share, yet nothing material regarding the Company's financial state appeared to have changed during the intervening period.  (*Id.* ¶¶ 65-70.)

The disparity between the 2017 and 2018 valuations can be explained in one of two ways, neither of which paints Newport Trust in a terribly flattering light.  Most likely, Newport Trust knew the Shutterfly offering price of $825 million undervalued the Company because its value was essentially unchanged since June 2017.  (AC ¶¶ 64-71.)  It is also possible, although less likely, that Newport Trust knew (or should have known) in June 2017 that the Company's value was going to decline even more to make it attractive for acquisition, in which case the 2017 valuation was improperly inflated.  Either way, by endorsing a valuation of Lifetouch that did not reflect the Company's actual value, Newport Trust breached its fiduciary duty of prudence.  (*Id.* ¶¶ 70-71, 99-101.)

18

a. <u>Newport Trust's Purported Factual Assertions Regarding the Shutterfly Purchase Price Should Not Be Credited on a Motion to Dismiss</u>

Virtually the entirety of Newport Trust's motion to dismiss rests on its assertion that "the total price that Shutterfly has actually paid to date to acquire Lifetouch stock is $56.01 per share, or $963 million in total."  (NT Mem. 2.)  Newport Trust claims that this "fact" vitiates Plaintiffs' claims under Federal Rule 12(b)(1) and (6).  (*Id.* 9-16.)

The basis for Newport Trust's "fact," however, is not anything found within the four corners of Plaintiffs' Complaint, but rather stems from the declaration of a Newport Trust employee, William Glasgow, and from the June 11, 2018 Form 8-K/A filing of Shutterfly. (NT Mem. 7.)  Newport Trust asks the Court to take judicial notice of the latter document. (*Id.* 7 n.5.)  The Court should not do so.

While a court may take judicial notice of an SEC filing on a motion to dismiss, it may not take notice of that document when it is offered for the truth of matters asserted therein.  *See Kushner v. Beverly Enters.*, 317 F.3d 820, 830 (8th Cir. 2003) (SEC filings do not merit judicial notice when offered for the truth of their contents because "[s]uch disputed papers should not be the subject of judicial notice on a motion to dismiss") (citing *Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 663 (8th Cir. 2001)); *see also Little Gem Life Scis., LLC v. Orphan Med., Inc.*, 537 F.3d 913, 916 (8th Cir. 2008).

Why should this Court credit the untested assertions of William Glasgow's Declaration and Shutterfly's SEC filing?  Plaintiffs have not had the opportunity to depose Mr. Glasgow.  They have taken no discovery about Shutterfly.  Just because something is

filed with the SEC does not make it true; the extensive body of securities fraud law provides a good demonstration of why.

Indeed, a cursory examination of Shutterfly's public filings shows why they cannot simply be accepted at face value, especially with the benefit of discovery.  Shutterfly filed a Form 8-K on April 2, 2018—coincidentally, the same day that Plaintiffs' amended complaint was filed.  (*See* Sauerwald Decl. ¶¶ 5-6.)[9]  Exhibit 99.3 to that filing contains the Consolidated Financial Statements of Lifetouch for the Years Ended June 30, 2017, 2016 and 2015, the first time such information has been made public.  (*Id.*, Ex. A at 1.)  According to that filing, "[t]he fair value of the common stock [of Lifetouch] at June 30, 2017 was estimated to be $63.00."  (*Id.* at 19.)  This information is purported to be the fruit of the "Independent Auditors" of Lifetouch as of August 9, 2017.  (*Id.* at 1.)

Yet, according to Exhibit 99.4 to the same Form 8-K, which purports to be the *Unaudited* Consolidated Financial Statements of Lifetouch, "[t]he fair value of the common stock at December 31, 2017 was estimated to be $56.00, and the fair value at June 30, 2017 was $56.00 per share."  (Sauerwald Decl., Ex. B at 18.)

It is curious why Lifetouch's audited and unaudited financials would contain different June 30, 2017 valuations of Lifetouch stock.  It is curious why the lower,

---

[9]   *See* Declaration of Justin Sauerwald, dated August 14, 2018 (abbreviated "Sauerwald Decl." throughout), filed contemporaneously with this brief.

unaudited valuation, $56.00, is the one that would be officially communicated to Lifetouch employees.  (AC ¶ 17.)[10]

Plaintiffs do not wish to turn this motion to dismiss into a motion for summary judgment.  The above information is merely offered to illustrate the unreliability of Shutterfly's SEC filings.  There are very good reasons why courts do not let such filings come in for the truth of their contents at the pleading stage, as the above contradiction amply demonstrates.

Even Mr. Glasgow's declaration, on its face, is dubious.  At one point he avers that "the total sale price of the Shutterfly acquisition to date is $963 million, or $56.01 per share."  (Dkt. No. 53 ¶ 21.)  Then he states that "in a recent June 11, 2018 Form 8-K/A filing, Shutterfly estimated that the preliminary purchase price consideration for the acquisition as of April 2, 2018 was more than $983 million."  (*Id.*)  Apparently, even Mr. Glasgow cannot keep straight what the right figure is.

This Court should not be engaged in a deep dive into Shutterfly's SEC filings to assess the accuracy of Plaintiffs' allegations.  "Materials outside the pleadings offered for such contradictory or supplementary purposes may not be considered."  *Dunnigan v. Fed. Home Loan Mortg. Corp.*, 184 F. Supp. 3d 726, 734 (D. Minn. 2016) (citing *Wieland v. U.S. Dep't of Health and Human Servs.*, 793 F.3d 949, 953 (8th Cir. 2015)).[11]  Plaintiffs

---

[10]    Indeed, if the actual value of Lifetouch was $63 per share as of June 30, 2017, then the Shutterfly acquisition is still too low even if Newport Trust's $900 million-plus figure is credited.

[11]    "[I]f the document merely creates a defense to the well-pled allegations in the complaint, then that document did not necessarily form the basis of the complaint. Otherwise, defendants could use the doctrine *to insert their own version of events into the complaint to defeat otherwise cognizable claims*."  *Khoja v. Orexigen Therapeutics, Inc.*,

have alleged that the Shutterfly purchase price was $825 million, notwithstanding cash and cash equivalents of unknown, and possibly nonexistent, value; that allegation should be taken as true by this Court.  (AC ¶ 70.)  *See Beaulieu v. Ludeman*, 2008 U.S. Dist. LEXIS 119324, at *33 (D. Minn. Feb. 7, 2008) ("[F]or the purposes of a motion to dismiss, this Court cannot look beyond plaintiffs' Complaint").

      b.  <u>Newport Trust Breached Its Fiduciary Duty of Prudence in Approving the $825 Million Purchase Price</u>

Nothing justifies Newport Trust's approval of the $825 million acquisition price by Shutterfly.  The value of Lifetouch had not materially changed since the June 2017 valuation, so a 17.5% decline in price makes no sense; it cannot have been based on a "trustworthy benchmark."  *Allen*, 835 F.3d at 679.  All Newport Trust had to do was investigate whether a 17.5% valuation decline in the absence of a material change in the Company's financial circumstances was justified, but it did not do so.  (AC ¶ 99.)  As with the 2015 and 2016 valuations, the specific facts detailing Newport Trust's investigative failure cannot be identified without discovery, but the surrounding facts speak for themselves, giving rise to an inference that Newport Trust's process must have been deeply flawed.  *Braden*, 588 F.3d at 595-96.  Accordingly, as with the Lifetouch Trustees' failure to investigate the imprudence of the 2015 and 2016 valuations, Newport Trust's failure to investigate the imprudence of the 2018 Shutterfly acquisition price constitutes a breach of its fiduciary duty of prudence.  (*See* p. 18, *supra*.)

---

No. 16-56069, 2018 U.S. App. LEXIS 22371, at *27 (9th Cir. Aug. 13, 2018) (emphasis added).

### III.    Plaintiffs Have Adequately Pleaded Breach of the Duty of Loyalty

It is well-established that "fiduciaries managing ongoing plans must discharge their duties solely in the interest of the participants and beneficiaries of the plans"—such is the fiduciary duty of loyalty.  *Bigger v. Am. Commercial Lines*, 862 F.2d 1341, 1346 (8th Cir. 1988); *Donovan*, 680 F.2d at 271 (fiduciary "decisions must be made with an eye single to the interests of the participants and beneficiaries") (citation omitted).

Here, the Board Defendants and Lifetouch manipulated the financial data that was provided to the independent advisor, leading to an artificially inflated valuation of Lifetouch stock in 2015 and 2016.  (AC ¶¶ 11, 16-17, 20, 61-62, 77-78.)  At the same time, multiple senior executives, and particularly Defendant and then-CEO Paul Harmel, were able to retire and cash out in part or in whole at an artificially high stock price.  (*Id.* ¶¶ 77-79, 115.)  The 2015 and 2016 valuations did not reflect the real value of the Company; the artificial inflation was only effectuated to enrich Defendant Harmel and others.  (*Id.*)

Such conduct is a textbook breach of the fiduciary duty of loyalty.  *See, e.g.*, *Martin v. Feilen*, 965 F.2d 660, 670-71 (8th Cir. 1992) (fiduciaries who enriched themselves to the detriment of their wards engaged in "reprehensible self-dealing").  Neither the Board Defendants nor Lifetouch can explain away these blatant violations of their fiduciary duties.

### IV.    Plaintiffs Have Adequately Pleaded a Breach of the Duty to Monitor

Under ERISA, a person with authority to appoint, maintain, and remove plan fiduciaries is a fiduciary with respect to that exercise of authority.  *In re Xcel Energy,* 312 F. Supp. 2d at 1176.  Those empowered to appoint and remove plan fiduciaries have a duty

23

to monitor those appointees, which includes a duty to act upon discovery that appointed fiduciaries are performing improperly. *Crocker v. KV Pharm. Co.*, 782 F. Supp. 2d 760, 787 (E.D. Mo. 2010).

Once the Board Defendants became aware that, first the Lifetouch Trustees, and then Newport Trust, had failed to investigate the imprudence of Lifetouch stock owing to the artificially inflated valuations of 2015 and 2016 and the improperly low acquisition price of 2018, they should have acted to pressure those Trustees to conduct the proper investigation or to value Lifetouch accurately, or, failing that, they should have removed those Trustees from their fiduciary positions. (AC ¶¶ 106-08.) Considering that the Board Defendants were responsible for the inaccuracy of the 2015 and 2016 valuations to begin with, their failure to act on the Lifetouch Trustees' inaction is especially egregious. (*Id.* ¶¶ 61-62, 77-79.) Accordingly, these fiduciaries breached their duty to monitor.

## V.   If the Court Grants Defendants' Motions to Dismiss, It Should Do So Without Prejudice

This Court should deny the Lifetouch Defendants' and Newport Trust's motions to dismiss in their entirety. If, however, the Court grants one or both of these motions, it should do so without prejudice to Plaintiffs' ability to file an amended complaint.

The Shutterfly Form 8-K filed on April 2, 2018, the same day as the operative complaint in this case, has provided new information that further explains Defendants' motivation for artificially inflating Lifetouch's stock price in 2015 and 2016 in breach of the fiduciary duties of prudence and loyalty. For example, the Form 8-K in its discussion of Lifetouch's Consolidated Financial Statements refers to something called the 2012

24

Omnibus Management Incentive Stock Plan, which provided for "the granting of stock options to purchase shares of the Company's stock and for other stock-based awards to certain key officers and members of its Board"—in other words, to many of the Board Defendants.  (*See* Sauerwald Decl., Ex. A at 20.)  In 2015, 737,890 such options were exercised by Board Defendants and other Lifetouch senior executives at a weighted-average price of $91.84.  (*Id.*)  Lifetouch repurchased those shares at $103.00.  (*Id.*)  The recipients of these options were enriched by more than $8.23 million in this transaction.  In 2016, 137,857 such options were exercised at a weighted-average price of $91.00.  (*Id.*)  Lifetouch repurchased those shares at $93.00.  (*Id.*)  The enrichment for these recipients was more than $275,000.  (*Id.*)

In 2017, however, after the June 2016 and 2017 valuations, *zero* such options were exercised.  (Sauerwald Decl., Ex. A at 20.)

Based on this information alone, it seems that Defendants—including perhaps the Lifetouch Trustees themselves—had every incentive to keep Lifetouch's stock price artificially inflated while senior executives and Board members were cashing in as part of this program; then, once they had done so, the stock price was allowed to descend to its real level, and no more cashing in was done.

Similarly, as discussed above, the audited financials of Lifetouch in 2017, only now available through Shutterfly's Form 8-K, suggest that the actual 2017 valuation of Lifetouch was $63 per share; thus, even if the Court were to credit Newport Trust's assertion that the acquisition price approximated a value of $56.01 per share, that price is

still too low, and constitutes a breach of fiduciary duty, when compared to the $63-per-share valuation.  (Sauerwald Decl., Ex. A at 20.)

The Shutterfly acquisition has only just enabled this review of Lifetouch's heretofore secret financials.  But what limited information has emerged further reinforces the misconduct that Defendants accomplished in connection with the 2015, 2016 and even 2017 valuations of Lifetouch stock.

Thus, if the Court decides to grant Defendants' motions to dismiss, it should do without prejudice, because Plaintiffs have here set forth "'the substance of the proposed amendment to the district court.'"  *In re 2007 Novastar Fin. Inc., Sec. Litig.*, 579 F.3d 878, 884-85 (8th Cir. 2009) (quoting *Clayton v. White Hall Sch. Dist.*, 778 F.2d 457, 460 (8th Cir. 1985)) (additional citations omitted).

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that Defendants' Motions to Dismiss the Amended Class Action Complaint be denied in their entirety.  In the alternative, if Defendants' Motions are granted, Plaintiffs respectfully request that the Court do so without prejudice.

DATED: August 14, 2018          By:  */s/ Samuel E. Bonderoff*
                                     Samuel E. Bonderoff


**ZAMANSKY LLC**

Jacob H. Zamansky (admitted *pro hac vice*)
Samuel E. Bonderoff (admitted *pro hac vice*)
Edward H. Glenn, Jr. (admitted *pro hac vice*)
Justin Sauerwald (admitted *pro hac vice*)
50 Broadway, 32nd Floor
New York, NY  10004
Telephone:  (212) 742-1414
Facsimile:  (212) 742-1177
*jake@zamansky.com*

*Additional Counsel for Plaintiffs and the Putative Class*


**Douglas J. Nill, PLLC**
**d/b/a FarmLaw**

Douglas J. Nill (# 0194876)
2050 Canadian Pacific Plaza
120 South Sixth Street
Minneapolis, MN  55402-1801
Telephone:  (612) 573-3669
Facsimile:  (612) 330-0959
*dnill@farmlaw.com*

*Counsel for Plaintiffs and the Putative Class*